(95 South. 391)

No. 24851.

## TOWN OF MANDEVILLE v. PAQUETTE et al.

(May 29, 1922. On Rehearing, Jan. 27, 1923.)

*(Syllabus by Editorial Staff.)*

1. **Principal and surety** ⚖129(2) — **Suretyship; change in terms of payment under contract held not to release surety.**

Though a change in the terms of payment under a contract with a town for the construction of a sea wall enabled the contractor to set the piling faster than he was able to do the backfilling, and though the absence of backfilling resulted in the wall sustaining greater damage from a storm than it otherwise would, the contractor's surety *held* not thereby released, where the contractor was not required by the town to do the work in that way, and it was not forbidden by the contract, the bond forbade changes only by increasing the amount to be paid by more than 10 per cent. of the amount of the bond, and the surety after such change, in consenting to an extension of time, admitted that the contract had been satisfactorily performed to that date.

2. **Principal and surety** ⚖117—**Suretyship; town not liable for change in terms of payment by property owners.**

Where contract with town for construction of sea wall required contractor to collect part of price from property owners of property, the town was not responsible for the act of the property owners in agreeing at the contractor's request to pay part of the price in advance, though the contractor's surety claimed this enabled the contractor to do the work in an unsafe way.

3. **Municipal corporations** ⚖364—**Failure of town to pay damage from storm held not to justify nonperformance of contract.**

Assuming that a town under a contract for the construction of a sea wall was liable for damage caused by a storm, its failure to pay such damage did not justify the contractor in refusing to resume the work, where the only stipulation in the bond on the subject was that in the event of such a catastrophe the time for completing the work should be extended.

4. **Municipal corporations** ⚖347(1)—**That sea wall damaged by wreckage from town's pier did not prevent liability on bond.**

That a sea wall being constructed under a contract with a town was damaged during a

153 LA.—2

storm by wreckage from the town's pier or wharf blown against it did not defeat an action on the contractor's bond for the damages from his failure to complete his contract.

5. **Principal and surety** ⚖90 — **Suretyship; contractor's failure to carry insurance held not to release surety.**

The failure of one contracting with a town to construct a sea wall to carry storm insurance as agreed was not a fault on the part of the town releasing the contractor's surety from liability for the contractor's default.

6. **Principal and surety** ⚖121 — **Suretyship; town held not to owe surety obligation of interfering with contractor's method of doing work.**

Where a contract with a town for the construction of a sea wall contained no stipulation as to how nearly backfilling should keep pace with the setting of piling and putting on of the coping, the town owed no obligation to the contractor's surety to interfere and see that contractor did not leave a long row of pilings unprotected by backfilling and exposed to damage by storm, especially where the municipal authorities supposed the work was protected by insurance against storm damage.

7. **Municipal corporations** ⚖348—**Town held to have sustained damage from contractor's default in excess of amount of judgment.**

A town *held* to have suffered damage from a contractor's failure to complete his contract for the construction of a sea wall in an amount in excess of $7,500, the amount of a judgment recovered against the contractor and his surety.

8. **Judgment** ⚖323—**Correction of mistake in designating defendant without citing it to show cause why correction should not be made not error.**

In an action against the American Surety Company, where the court in rendering judgment erroneously described it as "the defendant, American Bonding Company," there was no error in directing the clerk to strike out the name improperly used and insert defendant's name, without citing defendant to show cause why the correction should not be made, as the error was of little or no importance.

Appeal from Civil District Court, Parish of Orleans; Porter Parker, Judge.

Action by the Town of Mandeville against J. J. Paquette and another. From a judgment for plaintiff, the defendant American Surety Company appeals. Affirmed.

Denegre, Leovy & Chaffe and Harry McCall, all of New Orleans, for appellant.

W. O. Hart, of New Orleans, H. E. Ellis, of Covington, and M. R. Newhauser, of New Orleans, for appellee.

By Division B, composed of Justices O'NIELL, LAND, and BAKER.

O'NIELL, J.   The American Surety Company has appealed from a judgment condemning the company to pay $7,500, with legal interest from judicial demand, as surety on a contractor's bond. The contract between J. J. Paquette, contractor, and the town of Mandeville, dated the 1st of May, 1914, was for the construction of a sea wall, 7,000 feet long, in front of the town. The condition or obligation of the bond was that the contractor should indemnify the town of Mandeville for any loss or damage arising directly by reason of a failure of the contractor to faithfully perform the contract, a copy of which was annexed to the bond.

The contract was originally let to a contracting firm named Kitteringham & Mongeau.   Paquette took over the interest of Kitteringham, and the contract was made with Paquette & Mongeau. Thereafter, with the consent of the municipality and the surety company, Mongeau sold out to Paquette, who assumed all of the obligations of the original contractors.

The contract price of the sea wall complete was $28,860, less $1.60 for each linear foot of wall in front of private property, which sum of $1.60 per linear foot was to be collected by the contractor from each property owner and be deducted from the contract price.   The contractor assumed all responsibility for the collection of the extra $1.60 per linear foot of sea wall, and was obliged to allow the deduction from the contract price of $28,860, whether he collected or failed to collect from the property owners. The town was to pay at the same rate, $1.60 per linear foot, for the parts of the wall passing opposite the ends of public streets. Payments were to be made as follows: $10,-000 when the concrete piles would be made; $1,000 on completion of each city square, approximately 550 feet, of sea wall, less the sums to be collected by the contractor from the property owners, at $1.60 per linear foot; and the balance of the contract price was to be paid within 10 days after completion of the work and on proof of payment of all claims for material and labor.

The work was to be completed on or before the 1st of January, 1915.   On the 17th of November, 1914, the contractor requested and was granted an extension of time for the completion of the work, to the 1st of August, 1915, to which the surety consented in writing.   On the 20th of July, 1915, the contractor asked for and was granted a further extension, to the 1st of January, 1916, to which the surety again consented in writing.

On the 1st of January, 1915, the date on which, originally, the construction of the sea wall was to be completed, the contractor had done nothing more than to mold the concrete pilings, 3,500 in number, and distribute them along the lake shore.   The town then made the first payment of $10,000, according to contract.   The contractor began sinking the pilings along the line of the proposed sea wall, according to the plan and specifications; and, after extending the row of pilings about 1,600 feet, he began filling in behind the pilings with sand, by means of a suction dredge.   It is conceded that it was necessary to have a row of piling that length before commencing to fill in, because the sand would spread laterally behind the piling.   For lack of dredging capacity, it required nearly three months to fill up to the shore grade, according to specifications, behind one city square, approximately 550 feet, of piling.   In the meantime, the crew that

was setting the pilings had extended the row about 2,200 feet. It became obvious then that, at the rate of progress of the dredging crew, the contractor would take three or four years to complete the contract. The mayor of the town therefore called the contractor's attention to the fact that, unless he made arrangements to speed up the filling in behind the pilings, he could not complete the work within the time specified in the contract. The contractor replied that he had not the funds necessary to increase his dredging capacity, but that he could get the Jahncke Company to do the backfilling, if he could complete the setting of the pilings and put on the coping, so that the Jahncke Company's dredges could work continuously. The contractor also stated that he was not financially able to complete the setting of the pilings and to put on the coping, unless the town or the property owners would advance 80 cents per linear foot when the pilings were placed and the coping put on. The mayor replied that the contractor would have to consult the property owners. On the 24th of June, 1915, the property owners signed an agreement to pay the contractor 80 cents per linear foot when the pilings would be placed and the coping put on, and, on the 5th of July, 1915, the municipal council adopted an ordinance agreeing to make similar payments for the piling and coping opposite the ends of public streets. That change in the method of payment is the main defense of the surety company in this suit. On the 29th of September, 1915, an unusually violent tropical storm came and wrecked many of the pilings that were not protected by backfilling.

After the storm, the contractor's son, who had been superintending the work, began gathering up his storm-tossed equipment and material. The contractor then told the mayor that he intended to complete the work. On the 27th of October, 1915, the mayor no-tified the contractor and the surety company, by registered letter, that the work had not been resumed, and demanded that it be resumed. It had required all of that time for the contractor's son to gather up his equipment, tools and materials. In the latter part of November, 1915, the mayor made another demand upon the contractor and the surety company, by registered letter, to proceed with the work. In response, the attorney for the contractor came to Mandeville and requested the municipal authorities to pay for the damage wrought by the storm. The town council requested that the work be completed, leaving the matter of the storm damage for future adjustment. A week later, the attorney for the contractor advised the municipal authorities, by letter, that the contractor had arranged with another contractor to complete the work, provided the latter could procure a satisfactory bond. About that time, several creditors of the contractor levied attachments upon his equipment and put an end to all hope of his resuming the work. As soon as the extension of the time for completing the contract had expired, the town council adopted an ordinance declaring the contractor in default, and again notified the surety company.

Thereafter the municipal authorities advertised for bids for the completion of the work, but did not receive a satisfactory bid. Then the town had another survey made, bringing one end of the sea wall 65 feet nearer the beach, so as to reduce the cost of filling behind the pilings. A contract was then let to another contractor, the Black & Laird Construction Company, to build the wall on the new line, for $20,840, with the stipulation that, if any property owner should refuse to pay his pro rata of the $1.60 per linear foot, the contractor might abandon the contract. After the Black & Laird Construction Company had constructed the wall in front of several squares, one of the property

owners refused to pay the $1.60 per linear foot, and the company gave up the contract. The sea wall has not been completed.

It was stipulated in the contract that the contractor should carry, cyclone or storm insurance on the work, but the amount of insurance was not stipulated. As a matter of fact, the contractor did not carry any insurance on the work; but the municipal authorities were not aware of his neglect in that respect. It was also stipulated that, if the contractor should be delayed by a storm or other casualty for which the contractor was not liable or responsible, the time fixed for the completion of the work should be extended for a period equal to the time lost.

It was stipulated in the contractor's bond that, in the event of any default on the part of the contractor, a written statement of the particular facts showing such default and the date thereof should be given by registered letter addressed to the surety company at its office in New Orleans, within 10 days after the municipal authorities learned of such default. It was also stipulated that the plans or specifications should not be changed so as to increase the amount to be paid the contractor more than 10 per cent. of the amount of the bond, without the written consent of the surety company. It was also stipulated that the surety company should not be liable for any damage resulting from "the elements or acts of God," or for the repair or reconstruction of any work or material damaged or destroyed by any such cause.

When Paquette abandoned the work, the town had paid him, in addition to the first payment of $10,000, $642.40 for piling and coping in front of the public streets, at $1.60 per linear foot; and he had collected $144 from a property owner, in front of whose property the sea wall was completed. Thereafter, the town paid to the Black & Laird Construction Company, for work done ac-cording to the new plan, $10,188.78, and paid into court in concursus proceedings brought by creditors of the construction company $1,867.72. The construction company also collected from property owners, at $1.60 per linear foot for piling and coping, $5,148.80. The total of all sums paid for the partially built sea wall was therefore $27,891.70, being all but $868.30 of what the sea wall should have cost, complete. The evidence shows that it would have cost $12,500 to have completed the wall according to the original plan and specifications, regardless of the storm damage, and that the storm damage was approximately $6,000.

The defenses urged by the surety company are summarized in the brief as follows:

First. That the change in the terms of payment, whereby the property owners agreed to pay 80 cents per linear foot when the pilings were set and the coping put on, and whereby the town agreed to make similar payments for the piling and coping opposite the ends of public streets, was prejudicial to the surety on the contractor's bond, and was made without the surety's knowledge or consent.

Second. That the surety company was not given timely notice of default, according to the terms of the bond.

Third. That the contractor was justified in refusing to resume the work when the municipal council refused to pay for the storm damage.

Fourth. That the damage done to the pilings was caused largely by timbers that were detached from the town's wharf or pier and battered against the piling.

Fifth. That the municipal authorities were aware of the fact that the contractor was not carrying storm insurance, and failed to inform the surety company of the neglect, or to take any action in the matter.

Sixth. That the damage wrought by the storm was, in large measure, due directly to

the fact that there was no backfill behind the pilings, which condition was caused by the action of the municipal authorities and of the property owners.

Appellant contends, too, that there is no proof of any damage allowable under the bond, and, in any event, that the judgment is invalid because it was corrected in an ex parte proceeding before it was signed.

[1] The reason why appellant contends that the agreement of the property owners and municipal authorities to pay 80 cents per linear foot for setting the pilings and putting on the coping was prejudicial to appellant as surety on the contractor's bond is that the change in the terms of payment enabled the contractor to set a longer row of pilings than he ought to have left exposed to the danger of a storm. That part of the wall where the backfilling was complete was not damaged by the storm; that part of the wall that was only partly backfilled was only partly damaged; and that part that was not backfilled at all was almost entirely destroyed. There is therefore no doubt that the storm would have done much less damage if the backfilling had been done as fast as the pilings were set and the coping put on. But it was not stipulated in the contract that the work should be done in that way; and it was no fault of the municipality or of the property owners that, for want of dredging capacity, the contractor was unable to do the work in that way. It is true the contractor's son testified, in substance, that his father was unwilling to leave a long string of piling and coping exposed to storm danger, and left it so exposed because of the insistence of the mayor of the town that the work should proceed faster. That testimony was contradicted by the mayor, who testified that he refused to have anything to do with the contractor's suggestion that the municipality pay for the setting of the piling and coping as the work pro-

gressed. The subsequent agreement of the town council to pay for the piling and coping in front of each street, as the work progressed, was not such a change as was forbidden by the terms of the bond; that is, by the stipulation that the plans or specifications should not be changed so as to increase the amount to be paid to the contractor more than 10 per cent. of the amount of the bond. The municipal government was not responsible for the generosity of the property owners in agreeing to advance the contractor 80 cents per linear foot of piling and coping, to enable him to complete his contract. The purpose was to aid the contractor, which, incidentally, was calculated to be of advantage to the surety on his bond; because, if the 80 cents per linear foot had not been advanced, the contractor would surely have defaulted on his contract. But there are three distinct and substantial reasons why the surety company cannot take advantage of that slight change in the terms of payment that was agreed to for the assistance of the contractor. The first reason is that the change did not require the contractor, but merely enabled him, at his own request, to proceed with the setting of the piling and coping, ahead of the backfilling, which method of doing the work was not violative of any stipulation in the contract. The second reason is that the change in the terms of payment was not violative of the stipulation in the bond itself, regarding a change in the plans or specifications. And the third reason why the surety company cannot take advantage of this slight change in the terms of payment is that the surety company apparently acquiesced in it. On the 20th of July, 1915, which was 15 days after the town council had agreed to pay for the piling and coping opposite the public streets, as the work progressed, and nearly a month after the property owners had agreed to pay the 80 cents per linear foot for the piling

and coping opposite their property lines, the contractor asked for and was granted his second extension of the term for completing the work; and the surety company then signed the act of extension, containing this important admission, viz:

"That said contract has been satisfactorily performed to the date hereof in accordance with its terms and to the satisfaction of the obligee."

If the contract was not being performed in accordance with its terms—if the setting of the row of pilings ahead of the backfilling was not in accord with the terms of the contract—the surety company should have complained before the municipality consented to an extension of the term for completing the work. The granting of the extension was for the benefit of the contractor, and incidentally for the benefit of the surety on his bond; because he would surely have defaulted on his contract if the extension had not been granted.

[2] Appellant's complaint that the municipality did not give timely notice of the contractor's default on his contract is unfounded. It is said in appellant's brief that there is no proof that the letter sent by the municipality to the surety company, of date the 27th of October, 1915, advising of the contractor's default, was sent by registered mail. It was admitted, however, in defendant's answer to this suit, that the letter of the municipality was so sent, and that defendant answered the letter on the 11th of November, 1915. It is argued that the municipality had no right or reason to select or fix the 20th of October as the date on which the default had occurred. The answer to that argument is that the contractor was, up to and even beyond that date, assuring the municipal authorities that he intended to resume and complete the work.

[3] Appellant's contention that the contractor was justified in refusing to resume the work when the municipal authorities re-

fused to pay for the storm damage is not well founded. Pretermitting the question as to who should have borne the loss caused by the storm damage, there was no stipulation in the bond to the effect, or even implying, that any such loss should be paid by the municipality immediately or as a condition for requiring the contractor to proceed with the work. On the contrary, the only stipulation in that respect was that, in the event of such a catastrophe, the term for completing the work should be extended for a time equal to the time lost by the catastrophe.

[4] The argument that the municipality was at fault because timbers from the town wharf, or pier, that was wrecked by the storm, were battered against the unfinished sea wall, is not tenable. Judging from the direction in which the wind blew, it is extremely doubtful that any of the wreckage from the municipal pier went in the direction of the pilings that were battered down. Be that as it may, it was surely no fault of the municipality if the wreckage from its wharf or pier was blown in the direction of the unfinished sea wall.

[5] It is argued in appellant's brief that the mayor of the town knew that the contractor was not carrying storm insurance, and failed to inform the surety company of the neglect. On the contrary, the mayor testified that he did not know, until after the storm, that the contractor had neglected to take out storm insurance. He had previously asked the town's attorney whether there was any obligation on the part of the municipality in that respect, and the attorney had advised him that it was the duty of the contractor and the surety on his bond to see that he maintained storm insurance. In so far as maintaining storm insurance was one of the obligations of the contractor, his neglect was surely no fault of the obligee. It would be anomalous to hold that, in a contract of suretyship, warranting that a build-

ing contractor will fulfill the obligations of his contract, the obligee owes a duty to the surety to see that the contractor, as principal obligor, does not violate his contract.

[6] The sixth complaint of appellant is merely a repetition of the first; that is, that the storm damage was the result of the contractor's leaving a long row of pilings unprotected by backfilling. There was no obligation on the part of the municipality to interfere with the contractor's method of doing his work, so long as he did not violate his contract. There was no stipulation in the contract as to how nearly the backfilling should keep pace with the setting of the pilings and putting on the coping. The supposition of the municipal authorities was that the work was protected by insurance against storm damage, and that the contractor could safely proceed with the setting of pilings and putting on the coping, as far as he saw fit to proceed, ahead of the backfilling.

[7] The argument that the evidence does not establish that the town suffered a loss by the contractor's failure to carry out his contract is not borne out by the figures. It is true, the Black & Laird Construction Company, after Paquette had defaulted on his contract, contracted to construct the wall on the new plan for only $20,845. The property owners' share of the cost, at $1.60 per linear foot, was to be approximately $8,720. The town's share of the cost, therefore, would have been $12,125. The town would have had to pay Paquette a balance of $7,818, if he had completed the work. Applying that balance to the Black & Laird Construction Company's contract would have left a balance of only $4,307 to be paid by the town. We obtain the figure, $7,818, by deducting from $28,860, the amount paid to Paquette by the town, $10,642, and the amount which the property owners would have had to pay, $10,400, being for approximately 6,500 linear feet of sea wall at $1.60 per foot. But it must be borne in mind that the Black & Laird Construction Company did not finish the work. And we must bear in mind, too, that the sea wall which the Black & Laird Construction Company contracted to build was a substitute, which would have brought the sea wall 65 feet nearer to the property line at that end of the wall which was never built. The evidence leaves no doubt that the town could not have had the sea wall completed on the original plan for $7,500, plus the balance that would have been due to Paquette if he had completed it; and the estimate of $7,500 does not include any storm damage.

[8] Adverting now to the complaint that the judgment was corrected in an ex parte way before it was signed, it appears that, in rendering the judgment, the judge inadvertently called the defendant the "American Bonding Company." Two days later, plaintiff's attorney discovered the error, and, upon his calling the court's attention to it, the judge ordered the clerk to correct the error by striking out the name American Bonding Company, and inserting the name American Surety Company of New York. Inasmuch as the American Bonding Company, though not a party to the suit, was called by the judge "the defendant, American Bonding Company," it cannot be doubted that the use of the word "bonding" instead of the word "surety" was an error of little or no importance. It was not necessary to cite the defendant, American Surety Company, to show cause why such an error should not be corrected, before the judgment was signed. If the judge had not made the correction, we would make it now.

The judgment is affirmed at appellant's cost.

## On Rehearing.

OVERTON, J. Since the argument of this cause on the rehearing granted, we have

again carefully considered it. Our re-examination of the case satisfies us with the correctness of our views expressed on the original hearing.

For the reasons assigned, it is ordered, adjudged, and decreed that our judgment heretofore rendered be reinstated and made the final judgment of this court.

DAWKINS, J., dissents.