(90 South. 647)

No. 23145.

JACOB A. ZIMMERMAN & SON, Inc., v. UNITED STATES FIDELITY & GUARANTY CO. et al.

(Jan. 2, 1922. Rehearing Denied Jan. 30, 1922.)

*(Syllabus by Editorial Staff.)*

1. Contracts ⬅➡301—Principal and surety ⬅➡ 119—Suretyship; contract held to give right to contractor to take over work on default of subcontractor.

A contract between contractor and a subcontractor and his surety provided that, on subcontractor's failure to perform and failure of the surety to perform after notice, the contractor could annul the contract or employ additional force or relet the work. After more than one-half the allotted time had passed and only one-tenth of the work had been done, and surety had failed to act, the contractor relet the work. *Held*, in view of a provision that if the subcontractor violated the contract the contractor might take over the contract after notice to the surety, that the contractor's act was justified.

2. Contracts ⬅➡300(1)—Accumulation of rubbish by dock board held no ground for delay by subcontractor.

Where a subcontractor had agreed to drive piles for a wharfhouse, the accumulation of rubbish by the dock board, which the subcontractor had contracted to remove, was no defense for delay in performance in a suit by the contractor.

3. Contracts ⬅➡300(1)—Requirements of contractor that subcontractor put pile drivers on barges held not to excuse delay of subcontractor.

Where subcontractor had agreed to drive piles for a wharfhouse, the requirement of the contractor that the pile drivers should be placed on barges in order to do the work properly was no defense in an action by the contractor for delay in performance.

4. Contracts ⬅➡299(1)—Delay in performance by subcontractor held attributable to him.

In action by a contractor against his subcontractor for delay in driving piles used in building a wharfhouse, where the subcontractor had no followers, instruments which were necessary in the work, delay on this account was the fault of the subcontractor, who had agreed to furnish all necessary tools and appliances to complete the work.

5. Contracts ⬅➡300(3)—Delay by subcontractor held not caused by delay of contractor's engineers.

Where a subcontractor had contracted to drive piles for a wharfhouse, the points to be located by the contractor's engineers, who were capable men and located 75 points a day, and in their work were delayed 1 point in 75, the delay of the engineers constitutes no defense for the delay of the subcontractor in a suit against him by the contractor.

6. Contracts ⬅➡300(3)—Delay caused by contractor's superintendent announcing his intention to take over work of subcontractor constitutes no defense for delay by subcontractor.

Where a subcontractor agreed to finish the work on a certain day and when more than one-half the time had passed only one-tenth of the work was done, in view of the fact that the subcontractor had failed to comply with the contract, delay caused by the announcement of the intention of the contractor's superintendent to take over the work is no defense in a suit by the contractor against the subcontractor.

7. Contracts ⬅➡300(1)—Requiring subcontractor to pay 10 per cent. for financing pay rolls and to share commission for clearing wharves was no defense for contractor for delay.

In a suit by a contractor against his subcontractor for delay in driving piles for a wharfhouse, the fact that the contractor charged the subcontractor 10 per cent. to finance his pay rolls and required him to divide with the contractor a 15 per cent. commission which the dock board paid the subcontractor for clearing wharves is no defense in a suit for delay by the contractor.

**8. Contracts ☞296—Principal and surety ☞ 100(4)—Suretyship; change in plan by contractor held no defense in suit by contractor against subcontractor and surety for delay.**

Where a contract between a contractor and his subcontractor and the latter's surety provided that no change in the plans should release either the subcontractor or his surety, the contractor's ordering pile drivers to be placed on barges did not release the surety or the subtractor from liability in a suit by the contractor for delay in performance.

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

Action by Jacob A. Zimmerman & Son, Inc., against the United States Fidelity & Guaranty Company and others. From judgment for plaintiff, defendants appeal. Affirmed.

P. M. Milner, of New Orleans, for appellant Carey & Boettner.

J. Zach Spearing, of New Orleans, for appellant United States Fidelity & Guaranty Co.

Hall, Monroe & Lemann, of New Orleans, for appellee.

LAND, J. [1] The plaintiff, Jacob A. Zimmerman & Son, Inc., entered into a contract and agreement with the board of commissioners of the Port of New Orleans for the construction of a wharfhouse and warehouse E and runways, and on August 5, 1915, plaintiff sublet to the defendant Carey & Boettner the work of driving all piles of the wharfhouse and runways 1, 2, and 3 for the sum of 4¾ cents per lineal foot of pile. It was agreed between plaintiff and its subcontractor that this work should progress in the following manner:

"The wharfhouse to be divided into four (4) groups, each group to be driven simultaneously.

"Group 1 to consist of all piles bounded by Piers 20-216-34-202.

"Group 2 to be bounded by Piers 35-61-201-175.

"Group 3 to be bounded by Piers 62-88-174-148.

"Group 4 to be bounded by Piers 89-102-147-134.

"Not less than forty (40) piles to be driven in each group per day.

"If warehouse E and the balance of the wharfhouse are to be built the piling for same is to be furnished at the same rate and under the same contract conditions."

The subcontractor, Carey & Boettner, and the defendant United States Fidelity & Guaranty Company, agreed and bound themselves in solido at their own proper cost to furnish all materials, apparatus, falsework, machinery, tools, and labor necessary and requisite for and to perform, construct, complete, and deliver in a substantial and workmanlike manner, to the entire satisfaction of Ford, Bacon & Davis, engineers, all of the work embraced in the plans and specifications of the Port Commission for the construction of wharfhouse warehouse E, attached runways, and other appurtenances in strict accordance with the specifications of date June 5, 1915, and with the plans accompanying said specifications, which were signed by said contracting parties as a part of said subcontract.

The subcontractor agreed to begin active work within 5 days after the signing of the contract and to fully complete same before October 10, 1915. See XII Contract.

It is provided in said contract that, if it should appear by the report of the engineers that the rate of progress of the work is not such as to insure satisfactory completion of same within the time designated in said contract, or within any additional time which may have been granted as in said contract provided; or in case the works, for want of sufficient or proper workmen or material, are not progressing with what the engineers shall consider to be due dispatch, that the contractor shall notify the subcontractor in writing wherein they believe the specifications are being violated, and, at the same time, demand immediate compliance with same, and should the subcontractor fail, upon receipt of notifi-

cation to immediately comply with the specifications, that it shall be the duty of the contractor to notify the bondsman, and, should the bondsman in turn fail to effect a compliance with the specifications within 48 hours of the said notice, that the contractor shall be privileged to annul the contract, or said contractor shall have the right to employ additional force or relet said work without advertisement, or to have the work completed for the account of and at the expense of the subcontractor and his sureties, and to retain and to appropriate toward the completion of said contract all amounts due or to become due the subcontractor from the time he is in default of said work, and that if it so elects, may enter in and take possession of the works and of the plant, tools, and other materials of the subcontractor and may use same as the absolute property of the contractor; and that the subcontractor and his sureties in any or every such case shall be liable for all expenses, damages, and extra expenditures which may be incurred by reason thereof, the amount and reasonableness thereof to be determined by the engineers, whose decision it is agreed shall be final and binding; and that all the power of the said engineers with respect to the determination of the sum or sums, or balance of money, to be paid or received from said contract, and otherwise in respect to said contract, shall nevertheless continue in force with respect to same, as though the work had been executed and completed by the subcontractor. See XV Contract.

The subcontractor under said contract agreed to furnish a bond with a surety company satisfactory to the contractor, as surety for the amount of $6,000, so as to guarantee to the contractor the proper performance by the subcontractor of all and singular the obligations assumed by said contractor under said contract, which bond was furnished by the defendant United States Fidelity & Guaranty Company.

The plaintiff, Jacob A. Zimmerman & Son, Inc., bound itself to fully complete the construction of the wharfhouse and warehouse E and runways before April 1, 1916, and to have all tools, equipment, surplus, and waste materials removed from the site before April 1, 1916, and in default thereof to pay the Port Commission the sum of $300 for each and every day thereafter until the work is so completed and tools and materials removed.

Alleging the failure of the subcontractor, Carey & Boettner, to prosecute the work of driving these piles in a substantial and workmanlike manner, or to the satisfaction of the engineers, and their failure to divide the work into four groups as provided in the contract, and to operate a pile driver on each group, driving not less that 40 piles in each group per day, petitioner avers that toward the beginning of September, 1915, it was beginning to become apparent that Carey & Boettner would not be able to complete their contract within the time and in the manner therein provided, and that, after repeated complaints by the engineers to petitioner, and by petitioner to the subcontractor and the surety company, without avail, and after putting both defendants in default, it was compelled to relet one-half of the work to Doullut & Williams at 7½ cents per foot and itself to undertake to do the rest of the work, and that petitioner completed its half of the work with all possible dispatch and at a minimum cost of $12,778.50, and that petitioner was compelled to pay to Doullut & Williams the sum of $16,933.20.

Petitioner avers that, after allowing said subcontractor, Carey & Boettner, all credits due them, they owe a balance to petitioner of $16,305.10, and that to the extent of $6,-000 defendant surety company is liable to petitioner in solido with the said Carey & Boettner upon its bond, and prays for judgment accordingly.

The testimony shows that the subcontractor, instead of operating four pile drivers, each driving 40 piles per day, had never gotten into operation at any time more than two pile drivers and for a considerable portion of the time was operating only one pile driver.

The driving of these piles was preliminary work, which had to be finished before the construction of the wharfhouse could be commenced, and any delay in driving same necessarily delayed the completion of the wharfhouse, and would entail a heavy penalty of $300 per day as liquidated damages upon plaintiff, as provided in the contract.

Before the plaintiff took charge of one half of this work, and sublet the other half to Doullut & Williams, the plaintiff during the month of September, 1915, made frequent complaints, verbally and in writing, to the subcontractor and to the surety company, that the work of driving these piles was not progressing in accordance with the terms of the contract, and on September 20, 1915, Messrs. Carey & Boettner having failed to comply with the demand made upon them, plaintiff through its attorneys addressed to the bonding company a letter reading as follows:

"September 20th, 1915.

"United States Fidelity & Guaranty Company, Whitney Central Building, New Orleans, La.—Gentlemen: We inclose herewith copies of our letters of September 16, directed to Messrs. Carey & Boettner and to yourselves. In connection therewith we now beg to advise you that Messrs. Carey & Boettner have failed to make any efforts to comply with the specifications embraced in the contract. In consequence, by virtue of section 15 of the contract to which you have subscribed, by reason of the bond which you have written, we beg to call upon you to do the work for the rest. We regret to state that, in default of a strict compliance on your part, within forty-eight hours, Messrs. Zimmerman & Son will find it necessary, either to annul their contract with Messrs. Carey & Boettner, with an attendant forfeiture on their part of any payments of moneys which may be due to the latter, or owing to them on the work already executed, or in the alternative to employ additional force or to relet the said work without advertisement, and to have the said work completed for the account of, and at the expense of the subcontractor and his bondsman."

The defendant surety company failed within the time limit provided for in the contract to effect a compliance with the provisions of the contract by the subcontractor, and plaintiff. through its attorneys, addressed to said company, under date of September 28, 1915, the following letter:

"September 28, 1915.

"The U. S. Fidelity & Guaranty Co., Whitney Bank Bldg., City—Gentlemen: Zimmerman, Inc., v. Carey & Boettner. Referring to our earlier written and verbal notice in this matter, we beg to advise that Jacob A. Zimmerman, Inc., have been compelled to relet one-half of the work to be done by Carey & Boettner to Doullut & Williams at 7½ cents per foot and to undertake themselves to do the rest of the work. This was the most advantageous arrangement they were able to make, after due notice to you as you are aware, and they will in due course, upon completion of the work, make claim against you for the amount of the loss and extra cost of the work."

In pursuing this course, plaintiff was acting clearly within the provisions of section 15 of the contract, which is the law governing this case.

The contract required the work of driving these piles to be completed on October 10, 1915. The subcontractor was notified to begin work on August 11, 1915. On September 27, 1915, the date on which plaintiff took over the work, or more than 30 days after the beginning of the work, when it should have been more than half finished, Carey & Boettner had actually driven 44,480 out of the total aggregate of 400,000 feet which had to be driven, or, in other words, had completed only about 10 per cent. of the work.

It is not, therefore, surprising that the engineers complained very often to plaintiff, the contractor, of the lack of progress on this

pile driver work, as testified to by Mr. G. Albert Zimmerman, who communicated these complaints to Carey & Boettner, and who also complained to them about the manner in which they were carrying out their contract and their failure to have the number of pile drivers on the work required by the contract.

This disposes of the contention of defendants that the plaintiff had no right to take over the work and arrange to complete it, no matter how clearly Carey & Boettner were in default, unless Ford, Bacon & Davis, the engineers, made complaint; especially as article 15 of the contract provides that, "if the subcontractor shall persist in any course violative of the provisions of the contract," the contractor may proceed at once to put him in default, and, after due notice to the surety, take over the contract.

[2] Among the defenses suggested by the answer, we find the alleged delay caused by rubbish and obstructions upon the wharf. The obstructions referred to, as shown by the record, had been accumulated by the dock board, and not by plaintiff, and Carey & Boettner had contracted with the dock board to remove them for a special contract price, which was paid them.

Under these circumstances, neither the subcontractor nor his surety have any just ground to complain that there was any delay caused by failure to remove these obstructions.

[3] The alleged delay caused by the requirement of Houch, Zimmerman's superintendent, that the drivers should be installed upon barges, cannot be successfully pleaded, as the testimony of Mr. Zimmerman shows that it was necessary for the drivers to be operated from barges in order to drive the piles properly, and the testimony of Brooks shows that when Houch arrived on the job, he found the equipment of Carey & Boettner in poor condition, and advised Carey that he must get the equipment in condition and on barges to handle the work and that Carey & Boettner did so. This fact proves conclusively that Carey & Boettner thought it necessary and proper to so operate the drivers. They followed the instructions of Houch, which they must have deemed proper, as they made no complaint whatever at the time. The record also shows that Doullut & Williams, who completed part of the contract, operated the drivers from barges, and that plaintiff, who took charge of the other part of the work, did likewise.

[4] As to the delay caused by the use of "followers": We find from the record that a "follower" is a sort of extension put upon the driver, or put upon the pile, so that the hammer of the driver will not have to go through the water to strike the top of the pile, and that such an instrument is absolutely essential, while they were driving in the water, to facilitate the work and to speed it up, and that Carey & Boettner had no followers. Therefore any delay from lack of followers was attributable solely to the negligence of the subcontractor, who had agreed to furnish all necessary machinery, tools, and appliances to complete the work, which was of an urgent nature, as it was to be finished within 60 days, so as to allow the contractor a reasonable time within which to complete the buildings by April 1, 1916, according to the terms of the contract.

[5] As to the alleged delay caused by the engineers: There seem to have been six or seven engineers employed on the work locating points, and that there were about 200 points to be located. The points were located by these same engineers for Doullut & Williams, who completed the job. They were capable engineers, and had to spot 75 points a day, and they were delayed one point in 75. There was no constant delay in getting these points.

[6] As to the alleged attempt, injury, and

delay caused by Houch's announced intention to take the contract from Carey & Boettner: This contention is without foundation. Carey & Boettner had failed utterly to comply with their contract, as they had completed only one-tenth of the pile driving in more than 30 days, when they should have completed more than one-half the work. In addition to this, we find in the transcript a list of 26 suits filed by various parties against Carey & Boettner in the civil district court of the parish of Orleans from July 1, 1909, to 1915. At the time of the trial of this suit, Carey admitted that he had defaulted upon a subcontract on the Elk's Home and that his contract on the job was taken over by Thatcher & Son. It was clearly to the interest of plaintiff as contractor to have the driving of these piles completed by October 10, 1915, and it would have been a foolish act for him to have interfered with this work, if it had been progressing with due dispatch. As the matter stands, plaintiff is out of pocket to the amount of $16,305.10, and is endeavoring in this suit to reimburse himself to the amount of $6,000 of this sum by obtaining a judgment against the surety of the subcontractor, under the plain terms of the contract signed by all the parties.

[7] The claim that plaintiff required Carey & Boettner to divide with plaintiff a 15 per cent. commission which the dock board paid Carey & Boettner for clearing wharves, and that plaintiff charged Carey & Boettner 10 per cent. for financing their pay rolls, even if proven, would not constitute in law any defense to this suit.

[8] The surety claims that the system or manner of doing the work required by said contractor was changed by the direction of plaintiff, and Carey & Boettner were thereby prevented from properly, economically, or satisfactorily carrying out or performing the work required under said contract; that such change in the plan or system of work was done without the knowledge, consent, or acquiescence of respondent; and that such change materially affected the doing of said work to the detriment, expense, and costs of Carey & Boettner and to the damage of respondent.

The defendant bonding company signed the contract, which contains in article XIV the following provisions:

"Neither the subcontractor nor his sureties shall be released from the whole or any part of the obligation hereby assumed by reason of any change in the amount, nature, scope, character or extent of the work, or in any plan or specification, or in the mode or time of payment, or by the consent to any subcontract, or by any extension of time or indulgence granted to the subcontractor, even though any or all of said acts be without the knowledge and consent of the subcontractor or his sureties, unless such release be expressly made in writing by said contractor."

This provision is a complete answer to respondent's contention. The drivers were placed on barges both by plaintiff and by Doullut & Williams in completing the contract, after it was taken out of the hands of the subcontractor.

The record shows that this was the proper method of driving the piles in order to expedite the work, and that "followers" were essential, while driving piles in the water.

The record fails to disclose that the cost of completing the work was excessive, but, on the contrary, shows that the work was finished to the best advantage possible under the circumstances.

No contention was made by either Carey & Boettner or by the bonding company that they had been delayed in any of the ways set up in the answer, when the work was finally taken out of the hands of Carey & Boettner by plaintiff, after repeated notices to Carey & Boettner and the bonding compa-

ny. Such defense, therefore, seems to be in the nature of afterthoughts.

The judgment appealed from is therefore affirmed.

MONROE, C. J., takes no part.