149 So.2d 632 (1963)
The STATE of Louisiana
v.
The PREFERRED ACCIDENT INSURANCE COMPANY OF NEW YORK.
No. 5263.
Court of Appeal of Louisiana, First Circuit.
January 18, 1963.
*634 Irwin Waldman, New York City, Porteous & Johnson by W. A. Porteous, Jr., New Orleans, for appellant.
Liskow & Lewis by J. L. Pelletier, Lake Charles, for appellee.
Before ELLIS, LOTTINGER, HERGET, LANDRY and REID, JJ.
LANDRY, Judge.
This action emanates from ancillary receivership proceedings incident to liquidation of the defunct corporation known as The Preferred Accident Insurance Company of New York (sometimes hereinafter referred to and designated simply as "Preferred"), a foreign corporation domiciled in the State of New York but authorized to do and doing business in this state.
Claimant, Arkansas Fuel Oil Corporation (hereinafter sometimes referred to simply as "Arkansas" or "Claimant") instituted the present proceeding against the Superintendent of Insurance of the State of New York, Domiciliary Receiver and Liquidator of Preferred (said Domiciliary Receiver and Liquidator being sometimes hereinafter referred to simply as "Liquidator") and Rufus D. Hayes, Insurance Commissioner of the State of Louisiana, Ancillary Receiver of Preferred (sometimes hereinafter referred to simply as "Ancillary Receiver"), seeking judgment against said Liquidator and Ancillary Receiver in the aggregate of $9,258.59, together with interest and costs. The demands asserted by claimant consist *635 of subrogated claims of materialmen arising from the performance of two certain building contracts entered into by and between claimant and a now bankrupt partnership known as Albright and Talley Construction Company for the remodeling of two service stations owned by claimant one in the Town of Delhi and the other in the Town of Bastrop, and on which said projects Preferred executed performance bonds in the capacity of Surety.
On May 27, 1958, the trial court rendered judgment in favor of Claimant and against both Liquidator and Ancillary Receiver ordering claimant's judgment paid from the proceeds of the special trust fund held by the Liquidator pursuant to an agreement between Liquidator and Ancillary Receiver approved by the court on February 4, 1954, which said agreement is hereinafter discussed in more detail.
Both Liquidator and Ancillary Receiver initially appealed the adverse judgment to this court wherein, upon appellee's motion to dismiss predicated upon the contention the amount in dispute then exceeded the jurisdiction of this court in matters of this nature, the matter was transferred to the Supreme Court. See State v. Preferred Accident Insurance Co. of N. Y., La.App., 110 So.2d 246.
In the Supreme Court claimant-appellee again moved to dismiss the appeal which motion was denied. State v. Preferred Accident Ins. Co. of New York, 238 La. 372, 115 So.2d 384. On July 1, 1960, the Supreme Court transferred the appeal to this court pursuant to the recent revision and amendment of the constitutional provisions governing appellate jurisdiction.
On January 3, 1962, Cities Service Oil Company was duly and properly substituted as claimant-appellee in place and stead of Arkansas Fuel Oil Corporation by virtue of the latter being assimilated into the former pursuant to merger. Henceforth in this opinion "claimant" shall be understood to be Cities Service Oil Company.
We believe a narration of the facts and circumstances culminating in the present action to be indispensable to a full understanding of the issues hereinafter set out and discussed.
Preferred, a casualty insurance company domiciled in the State of New York, was duly authorized to do and was engaged in business in this state. In accordance with our statutes, particularly LSA-R.S. 22:1021 and 1025, Preferred made special deposits with the Treasurer of this State aggregating the sum of $70,000.00. On April 30, 1951, Preferred was placed in liquidation because of insolvency, pursuant to order of the Supreme Court of New York issued in conformity with the statutes of that State. Appellant herein, Superintendent of Insurance of the State of New York was appointed Domiciliary Liquidator and Receiver of the defunct corporation.
Subsequently, on May 28, 1951, upon petition of the Insurance Commissioner of the State of Louisiana, said Commissioner was appointed Ancillary Receiver of Preferred for the State of Louisiana, in accordance with LSA-R.S. 22: Part XVI, and in such capacity, assumed responsibility for the control, disposition and distribution of the assets of Preferred within this state including the aforesaid special deposits in the sum of $70,000.00.
On or about November 25, 1953, the Liquidator and Ancillary Receiver entered into an agreement designed to expedite liquidation of the assets of Preferred held by the Ancillary Receiver while at the same time recognizing the legitimate claims of residents of Louisiana against the bankrupt in question. The agreement provided, inter alia, that the aforesaid special deposits were placed in the custody of the Liquidator in trust to be so held by him until the amount paid by the Liquidator out of general funds of the debtor corporation in his possession to Louisiana creditors equalled or exceeded the amount of the aforesaid special deposits entrusted to the Liquidator, at which time the funds in trust would then *636 be transferred to the general fund of the corporation in liquidation and the aforesaid trust would be dissolved. A significant provision of the agreement reserved to those Louisiana creditors of Preferred coming within the purview of LSA-R.S. 22:757-22:763 (the Uniform Insurers Liquidation Act), the right to have their claims against Preferred adjudicated in the ancillary liquidation proceeding being conducted at Baton Rouge, Louisiana, it being further provided in said agreement that the ancillary proceeding in this state would remain open for that express purpose. The agreement further provided that adjudication of the claims of Louisiana creditors would be in accordance with the Uniform Insurers Liquidation act. The agreement adopted the provisions of the Uniform Insurers Liquidation Act with respect to claimants being required to give written notice to both the Liquidator and Ancillary Receiver at least 40 days prior to the date set for a hearing on their claims and also provided that within thirty days of date of such notice the Liquidator would give notice in writing to both claimant and the Ancillary Receiver of intention to contest the claim if the Liquidator intended to do so. The aforesaid agreement was duly approved by the Supreme Court of New York on December 15, 1953, and by the Honorable Nineteenth Judicial District Court, Parish of East Baton Rouge, Louisiana, on February 4, 1954.
A joint stipulation and agreement of facts appearing of record herein reveals that the events culminating in the filing of the present claim are not in controversy as between the adverse parties to this proceeding. For all practical purposes only questions of law are herein presented for resolution. Claimant, Cities Service (Arkansas) is a foreign corporation authorized to do and doing business in this state, its principal offices being situated in Shreveport, Louisiana.
On October 20, 1950, Arkansas (predecessor to Cities Service) entered into two separate contracts with Albright and Talley Construction Company, a partnership composed of Iley Paul Albright and Dolen Edward Talley (sometimes hereinafter referred to simply as "contractor") for the remodeling and renovation of two service stations then owned by Arkansas and situated in the Towns of Delhi and Bastrop, respectively. The contract for the Delhi job covered remodeling for which the contractor was to be paid the sum of $6,780.00, while the agreement for the Bastrop project stipulated the contractor was to receive $13,900.00 for the renovation provided for therein. Both of said contracts required the posting of performance bonds which were obtained by the contractor from Preferred who signed said bonds as surety. By verbal agreement between Arkansas and the contractor, certain changes, alterations and additions were made to the plans and specifications covering both said projects. The changes called for in the Delhi job increased the contract price from the initial sum of $6,780.00 to $16,249.68, while those relative to the Bastrop project augmented the initial contract sum of $13,900.00 to $24,618.15. Preferred had no knowledge of the changes in question. Admittedly Preferred did not consent to any of the changes and neither did it receive any notice thereof from either Arkansas or contractor. The contractor subsequently defaulted in the performance of both projects. After the revised Delhi contract was completed and accepted and Arkansas had paid the contractor the original contract price of $6,780.00 and the additional sum of approximately $7,000.00 on the amended agreement, there remained a balance due contractor in the sum of $2,395.16. The contractor, however, then owed outstanding material claims in the sum of $3,449.57, which were paid by Arkansas against which contractor was given credit for the $2,395.16 remaining unpaid under the enlarged contract, thereby leaving a balance due in the sum of $1,060.41 which claimant seeks to recover herein. With regard to the Bastrop project, after paying all but $138.60 of the revised contract price of $24,618.15, Arkansas discovered that liens in the sum of $8,322.78 were outstanding against said work. Arkansas *637 then paid all said liens, credited contractor with the $138.60 balance due and herein seeks recovery from Preferred of the remainder. By written instrument Arkansas was legally subrogated to the rights of each materialman paid and herein seeks to enforce its rights as subrogee against Preferred.
The present action was initiated pursuant to the provisions of LSA-R.S. 22:760, it being conceded that notices and objections therein provided for were timely and properly given and made. It is important to note that Sections 757-763, Title 22 LSA-R.S. comprise and may be cited as the Uniform Insurers Liquidation law. It should be further noted that Paragraph A of LSA-R.S. 22:760 provides as follows:
"§ 760. Claims against foreign insurers
"A. In a delinquency proceeding in a reciprocal state against an insurer domiciled in that state, claimants, against such insurer, who reside within this state may file claims either with the ancillary receiver, if any, appointed in this state, or with the domiciliary receiver. All such claims must be filed on or before the last date fixed for the filing of claims in the domiciliary delinquency proceeding."
The above quoted paragraph of Section 760 is significant inasmuch as in the trial court the Liquidator and Ancillary Receiver moved to dismiss appellee's claim on the ground that claimant being a foreign corporation domiciled outside the State of Louisiana, may not prosecute these claims in this ancillary liquidation proceeding, said right and privilege being reserved, by the aforesaid provisions of the applicable statute, solely and exclusively to residents of this state. Appellants' said motion to dismiss was made after issue was joined and some evidence had been taken. The learned trial court referred the motion to the merits and subsequently overruled it. Appellants reurge the motion here. Appellee maintains the motion, being essentially an exception to claimant's alleged lack of procedural capacity, is in reality a dilatory exception which must be filed in limine litis and that in the instant case it came too late considering it was filed after issue was joined herein. Appellants contend, however, that under the plain terms of the statute there is a total absence of legal right to file a claim against the ancillary receiver unless claimant is a resident of the state, therefore, its motion or exception does not address itself to claimant's alleged lack of procedural capacity but rather to absolute lack of a right to proceed under the statute which deficiency may be asserted at any stage of the proceedings.
The exception of lack of procedural capacity (now included in the general "dilatory exception" LSA-C.C.P. Article 926) was formerly, and still properly is, intended to challenge the authority of a plaintiff who appears in a purely representative capacity or raise the issue of want of capacity of the plaintiff to institute and prosecute the action and stand in judgment therein. Central Surety & Ins. Corp. v. Canulette Shipbuilding Co., La.App., 195 So. 114. It has been properly held, we believe, that while all objections to the personal capacity of a suitor to stand in judgment should be made in limine litis, a total want of legal right in a litigant, in relation to the matters in controversy, should be taken into consideration at any stage of a proceeding. Wiseman v. Begnaud, La.App., 35 So.2d 836; Brown & Son v. Saul, et al., 4 Mart. (N.S.) 434, 16 Am.Dec. 175.
In support of its contention that the exception filed by appellants is dilatory and must be plead in limine litis, appellee has cited a single authority, namely, Outdoor Electrical Advertising v. Saurage, 207 La. 344, 21 So.2d 375. The quoted authority, however, appears readily distinguishable from the case at bar in that it involves a situation wherein a corporation instituted action in this state without having first *638 qualified to do business within the state as required by law. The court therein very properly considered the exception was neither an exception of no cause of action nor one of no right of action since it had no connection with plaintiff's cause of action as such and neither did it show a want of interest in plaintiff as regarded the subject matter of the action. The court therein further pointed out that since the plaintiff did have an interest in the subject matter of the litigation, assuming its demand to have been dismissed on exception timely filed, plaintiff could have subsequently qualified to do business in this state and reprosecuted its said demand.
The case at bar presents a situation in which the courts of this state are fully open to claimant considering claimant has qualified to do business in this state. The question here is not whether the courts of this state are open to claimant as a matter of law because, having qualified to do business in this state, it is clear that claimant has thereby acquired the right to access to our courts as regards all actions which claimant may prosecute in this state pursuant to our laws. In virtue of present claimant having qualified to do business in this state it cannot be seriously questioned that said claimant is sui juris and capable of standing in judgment before our courts. The immediate question presented for resolution is whether a foreign corporation, sui juris under the laws of our state, falls within the classification of litigants authorized to prosecute the particular cause of action herein sought to be enforced. To maintain the present action it is not sufficient that claimant merely be sui juris quoad our laws; in addition, claimant must establish that it is a resident since the terms of the applicable statute clearly and expressly provide that an action against the Ancillary Receiver herein may be brought only by residents of the state. It appears, therefore, that unless claimant is a resident of this state, it is totally without right to prosecute the present demand notwithstanding claimant is sui juris and capable of standing in judgment before our courts. From the foregoing we conclude appellant's said exception to be peremptory rather than dilatory and, in addition, was timely filed.
The basic question presented by appellant's said motion (exception) is whether the present claimant is given the right pursuant to the aforesaid LSA-R.S. 22:760 (A) to assert its demand against the ancillary receiver in this state at its option rather than being restricted to presenting same before the domiciliary liquidator in the domiciliary state of New York. The option of presentation is granted by the statute to a certain class of persons and unless claimant falls within the category of persons upon whom said right of option is conferred, claimant cannot invoke the provisions of the statute but is relegated solely to prosecution of its claim against the domiciliary liquidator. The precise issue, therefore, is simply whether claimant is a "claimant * * * who resides within this state".
Interpretation of the statutory provision at issue herein must be accomplished in the light of certain rules of construction applicable pursuant to the jurisprudence and the statute itself. Firstly, the entire act must be construed to make it harmonize as a whole. Martin v. General American Casualty Company, 226 La. 481, 76 So.2d 537, 46 A.L.R.2d 1178. Secondly, the act itself provides that it "shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states that enact it".
Accordingly, in interpreting the statute resort may be had to the jurisprudence of sister states which have adopted the statute and which are therefore "reciprocal states", as well as the jurisprudence of our own state. Unfortunately, however, neither counsel nor this Court has found any decision of any jurisdiction decisive of the issue of whether a foreign corporation *639 authorized to do business in a state and having its principal office in said same state is a "claimant residing in the state" within the meaning of the term resident as used in LSA-R.S. 22:760 (Section 5 of the Uniform Insurers Liquidation Act, Uniform Laws Annotated).
In resisting claimant's right to proceed herein, counsel for the Liquidator relies upon the general rule that a corporation is a citizen of and domiciled in the State in which it was incorporated. Quoted by counsel is the following language appearing in Anderson v. Standard Accident Ins. Co., 36 F.Supp. 7 (D.C. of La.1941):
"The corporation's place of residence can legally be nowhere else than within the limits of the sovereignty that created it. * * * and although one may be permitted to transact business where its charter does not operate, this does not bring about a `residence' beyond the limits of the State where the corporation had its legal birth."
In further support of this principle counsel for appellants has cited and quoted from several federal cases and cases from other jurisdictions, including the following quotation from Ward v. Southern Sand & Gravel Co., 4 Cir., 33 F.2d 773:
"* * * a corporation cannot be a resident of another state than that in which it is created. Such is the uniform construction of statutes in which the term `resident' or `nonresident' is used, where the question is presented whether a foreign corporation is included in the term. * * * It may be allowed to transact business outside of the home state, but it does not by doing so acquire a residence elsewhere."
Nevertheless, the construction of statutes upon this point is not so uniform as this quotation might lead one to believe.
The following statement, called to our attention by counsel for claimant-appellee, appears in 20 C.J.S. Verbo Corporations § 1794, p. 18:
"A natural person cannot have either a domicile in the true sense or citizenship in two states or countries at the same time, and the same is true of corporations. They can, no more than natural persons, be made ubiquitous, and in this sense domicile and citizenship are equivalent. However, for some purposes and within some statutes, foreign corporations with an office or doing business within the state are deemed to be residents of the state. Thus, foreign corporations may be found within a state other than that of their creation for the purpose of being served with process, as shown infra § 1919 et seq. Also, a migratory or tramp corporation, organized under the laws of a foreign state for the purpose of doing business in the domestic state where its property is situated and all its business is transacted has been held to be a resident of the domestic state." (Emphasis supplied.)
Our own courts have held that foreign corporations having their offices in this State and qualified to do business in this State by registering the names of its agents for service of process, are domestic corporations or residents of this State for the purposes and within the meaning of our attachment laws. Consequently the property of such corporations is not subject to non-resident attachment. Burgin Bros. & McCane v. Barker Baking Co., 152 La. 1075, 95 So. 227; Normann v. Burnham's Van Service, La.App., 73 So.2d 640.
We also quote with approval the following appearing in Volume 14 C.J. Verbo Corporations § 31, p. 66:
"As a Resident or Inhabitant. Since a corporation is a person in the law, it is also to be deemed a `resident' or a `nonresident' of a particular state, county, or district within the meaning of a statute, if it is within the purpose and intent *640 of the statute, as in the case of statutes defining the jurisdiction of the courts, or relating to venue, taxation, etc. In like manner it may be an `inhabitant.' But a corporation is neither a resident nor an inhabitant within the meaning of a statute, where it is not within the purpose and intent of the statute." (Emphasis supplied.) See, also, 18 C.J.S., Corporations § 8b.
It appears, therefore, the purpose and intendment of a statute determines whether its terms embrace a foreign corporation duly qualified to do business in this state in the capacity of a resident of this state.
It is, of course, within the right and authority of this state to protect its citizens and residents in their persons and property while at the same time protecting those who lawfully do business within this state. The act in question (Uniform Insurance Liquidation Law) does not appear to favor either residents or non-residents of the states in which it applies. Its primary purpose appears to be to prevent creditors who are better informed from obtaining unfair preference and advantage to themselves by instituting attachment or similar proceedings against such property of the bankrupt debtor as may be found in their states, before ancillary proceedings are commenced and before less well informed creditors may take action to preserve and protect their claims. 9-B Uniform Laws Annotated 196. "The purpose of the act is to secure equal treatment for all creditors wherever situated." 46 A.L.R.2d 1186.
Where the Uniform Insurer's Liquidation Law does not apply, such as where the domiciliary state is not a reciprocal state as defined therein, seizure by a creditor prior to appointment of a receiver confers upon the seizing creditor a lien which is preferred over the rights of the receiver as well as those of other creditors. Martin v. General American Casualty Company, 226 La. 481, 76 So.2d 537, 46 A.L.R.2d 1178; Hankins v. Sallard, La.App., 188 So. 411. Where the statute does apply, however, such a preference is specifically proscribed. See LSA-R.S. 22:762.
In this connection we cite with approval the following language appearing in 46 A.L.R.2d 1185, regarding the alleged purposes and intent of the statute herein concerned.
Validity, construction and effect of Uniform Insurers Liquidation Act
§ 1. Scope and introduction.
The Uniform Insurers Liquidation Act deals with certain problems peculiar to the forced liquidation or reorganization of insurance companies having assets and liabilities distributed in two or more states. While the assets of an insurance company naturally have their situs mainly in the state of domicil of the company, a substantial portion thereof is normally scattered over the entire territory within which the company carries on its business. This is particularly true of the special deposits required by the laws of nondomiciliary states and of balances in the hands of insurance agents and policy premiums due but unpaid. Similarly the liability of an insurance company, consisting primarily of policy obligations, are also distributed over the several states in which the company does its business. Such wide distribution of assets and liabilities creates a formidable array of problems when liquidation, rehabilitation, or reorganization proceedings become necessary, and the equitable and expeditious solution of those problems is rendered the more difficult by wide differences in the provisions of the statutes of the several states regarding such matters as special deposits, preferred claims, securities, setoff, and the administrative and judicial procedures to be followed.
The Uniform Insurers Liquidation Act, which was designed to facilitate delinquency proceedings by eradicating these difficulties, was approved by the *641 National Conference of Commissioners on Uniform State Laws in 1939, and by the end of 1954 had been approved in fourteen states.
The Uniform Insurers Liquidation Law is a part of the Louisiana Insurance Code which code also provides for the deposit of security by foreign insurers as a prerequisite to issuing insurance policies in this State. (LSA-R.S. 22:1021 and LSA-R.S. 22:1025.) Such deposit is conditioned upon the "prompt payment of all claims arising and accruing to any person by virtue of any policy issued by any such insurer * * upon any property or other risk situated in this state," (LSA-R.S. 22:1022, emphasis supplied) and is "subject to any claims, liens or judgments that may be judicially obtained against any such company in the courts of this state, or arising from any contract of insurance, or indemnity, or fidelity, or guaranty entered into in this state * * *." (LSA-R.S. 22:1026, emphasis supplied).
It would seem therefore that a claimant who has been doing business in this State and, as a result of doing business in this State, has acquired an interest in such deposits equal to that of true residents and natural citizens of this State whose claims arise from any contract of guaranty entered into in this State. We see no valid reason why foreign corporations properly qualified to do business in this state should be discriminated against.
To hold as appellants urge, namely, that the Uniform Insurers Liquidation Law does not apply to foreign corporations notwithstanding their qualification to do business in a state in which the law is in force would lead to absurd and inequitable consequences as we shall forthwith attempt to demonstrate.
The Supreme Court of this state has established the rule that when the statute is not applicable, deposits in the hands of the Treasurer of this State are subject to attachment, garnishment or execution even during the period four months prior to commencement of delinquency proceedings. Martin v. General American Casualty Company, 226 La. 481, 76 So.2d 537, 46 A.L.R.2d 1178. The benefits and advantage of our attachment laws are available to foreign and non-resident corporations authorized to do business within this state. Jackson State Nat. Bank v. Merchants' Bank & Trust Co., 177 La. 975, 149 So. 539. If the statute does not apply to a non-resident corporation authorized to sue in the courts of this state such corporation would be in position to secure an advantage and preference over resident creditors by institution of proceedings forbidden and denied those creditors residing in this state. LSA-R.S. 22:762; Scott v. Baton Rouge Bus Co., La.App., 118 So.2d 486. Such a result is clearly contrary to the express purpose and intention of the Uniform Insurers Liquidation Law.
From the foregoing it follows that appellants' said motions (exceptions) were properly overruled.

ON THE MERITS
The record indicates that all claims herein sued upon were in payment of materials supplied, labor performed and sub-contracts entered into subsequent to December 31, 1950 (the time specified for completion of the work called for in each contract). It is conceded that claimant did not comply with the contractual provision requiring that claimant, as owner, notify Preferred, as surety, in writing of the default of the contractor when same occurred. Appellants' contentions herein are as follows: (1) payments made by claimant and forming the basis of the present action do not relate to the original contracts but rather to additions, alterations and changes ordered after expiration of completion dates fixed in the original contracts consequently they were in effect new contracts the performance of which was not guaranteed by Preferred; (2) alternatively, the increase in contract price by virtue of changes, alterations and additions, without the consent of *642 the Surety, from $6,780.00 to $16,249.68 in one instance and from $13,900.00 to $24,618.15 in the other and the extension of performance or completion time from two to virtually seven months in each instance, were changes of such substantial and material nature as to constitute deviations beyond those contemplated by the parties and Preferred, as surety, thereby releasing and discharging said surety from all obligations under the bond; (3) in the further alternative, appellants maintain the bond in question was not intended to indemnify the owner against the claims of materialmen; and (4) the surety was released from its obligations by virtue of Arkansas, as owner, having failed to comply with the terms of the bond requiring the owner to give the surety written notification of the contractor's default including therein the date and nature of such default.
On the other hand claimant contends (1) that the rule of strict construction of surety contracts does not apply to bonding companies engaged in the business of bonds for remuneration, consequently, the changes made in the contracts in question must be deemed within the contemplation of the terms of the performance bond in question; (2) the changes were in fact authorized according to certain terms and provisions of the construction contract between claimant and contractor which said construction agreement was incorporated in full into the bond by reference thereto in said bond; and (3) the bond being a statutory bond pursuant to the provisions of LSA-R.S. 9:4801-4817, all of the provisions of the statute must be considered as forming part of the bond, consequently, Preferred, as surety, may not assert the defenses in question against claimant as subrogee of materialmen considering LSA-R.S. 9:4806 provides that as against claims of materialmen the surety shall be entitled only to those defenses available to the contractor for whom he signed as guarantor. Predicated on this contention, claimant argues that having paid the claims of the materialmen and taken subrogation from them, claimant is entitled to all the rights and privileges of said materialmen the same as if the present action were one taken directly by the subrogors against the surety.
Before considering the respective positions of the contending parties herein, we believe it desirable to set forth certain jurisprudential rules and statutory provisions which we deem apropos the questions herein presented.
Article 3039 LSA-C.C. provides as follows:
"Suretyship can not be presumed; it ought to be expressed, and is to be restrained within the limits intended by the contract."
Despite appellants' contending to the contrary, the jurisprudence of this state appears well settled that the rule of strict construction of a surety contract applicable in the case of an uncompensated surety has no application to a compensated surety. Victoria Lumber Company v. Wells, 139 La. 500, 71 So. 781, L.R.A.1916E 1110; Natchitoches Sweet Potato Co. v. Perfection Curing Co., Inc., et al., 153 La. 916, 96 So. 808; Bickham v. Womack, 181 La. 837, 160 So. 431; Texas & Pac. Ry. Co. v. United States Fidelity & Guaranty Co., La.App., 16 So.2d 671.
Modifications and changes in contracts (even as regards contracts of insurance) must be made with the mutual consent of the parties upon a meeting of the minds of those involved. Isadore v. Washington Fire & Marine Insurance Co., La. App., 75 So.2d 247.
We shall consider first the contention of claimant that the changes and alterations complained of by appellant were authorized pursuant to the construction contract which was incorporated into the performance bond by reference thereto consequently there was no violation of any provision regarding notification of changes or alterations.
*643 In this regard claimant-appellee relies upon Article 24 of each construction contract which said article reads as follows:
"Article 24. Changes in the work. The Owner, without invalidating the Contract, may make changes by altering, adding to or deducting from the work, * * * the contract sum being adjusted accordingly. All such work shall be executed under the conditions of the original contract, except that any claim for extension of time caused thereby shall be adjusted at the time of ordering such change.
Except as provided in Articles 3, 9 and 18, no change shall be made unless in pursuance of a written order from the owner. * * *"
Article 18 referred to in the foregoing article deals with emergencies affecting the safety or life or of the structure or of adjoining property. Articles 3 and 9 referred to therein provide as follows:
"Article 3. Detail drawing and instructionsThe Owner shall furnish with reasonable promptness, additional instructions, by means of drawing or otherwise, necessary for the proper execution of the work. All such drawings and instruction shall be consistent with the Contract Documents, true developments thereof, and reasonably inferable therefrom. The work shall be executed in conformity therewith and the Contractor shall do no work without the proper drawing and instructions. In giving such additional instructions, the Owner shall have authority."
"Article 9. The Owner's Status. The Owner shall have general supervision and direction of the work. He has authority to stop the work whenever such stoppage may be necessary to insure the proper execution of the Contract. The term `Operations Manager', will mean the Owner or his representative."
The evidence with regard to the changes was summarized by the district judge, as follows:
"Earl P. Krumbholt, claimant's witness, testified he was operations manager for the claimant; that the original contracts (described in the contracts as `Remodeling Service Station') were for the adding of `a canopy and storeroom to an existing service station'; that as the job went along they decided to tear out an additional amount of concrete and put in new concrete, put in additional tanks, and make other alterations and additions to the building which work was `probably handled under a cost-plus 10% arrangement'; that no such changes in the contracts were discussed at the time the contracts were entered into. His testimony with respect to the Delhi contract also applied to the Bastrop contract.
"Upon cross-examination the witness testified that the changes were found to be necessary as the work progressed, and that after such work was begun `it was found that plumbing was bad, concrete around the station was bad, washing facilities were bad, and it was a natural thing to either do it then or forget it'. So also, they decided to remove the small facilities for the holding of gasoline and oil and increase the tankage; that they could have seen before the contract was entered into whether the concrete was in good condition or not, and could have provided for all this in the original contract, such as ripping up the old concrete and putting in new concrete, and installing new washing facilities and plumbing facilities; that they could have provided for additional tanks in the original contract, but did not decide on additional or larger tanks until after the job was started, and it was their practice after a contract was entered into and a job started, to make such *644 changes, alterations and additions as they decided should be made.
"He further testified that there were no written orders or written instructions to the contractor of these changes and that they were all handled verbally. The concrete was removed, he testified, because the grades were bad."
From the foregoing it is apparent that although the changes and alterations were of a material nature and involved substantial additional cost, they were not made pursuant to a written order as expressly required by Article 24 of the construction contracts. It is equally apparent that the aforesaid changes were not of the nature and character envisioned within the exceptions provided for in Articles 3, 9 and 18. It follows that claimant's contention that the changes were made in conformity with the construction contract and performance bond is devoid of merit.
Clearly such vast, material changes were not contemplated by the contract in question. It is equally clear that such substantial alterations and additions were not in compliance with the terms of the contract which expressly required changes and alterations be made in writing.
Appellee's next contention is that the rule of Stricti Juris governing the liability of a simple (uncompensated) surety is not applicable to the contracts of a bonding company insuring the performance of construction contracts as a business for profit (compensated surety) but rather, on the contrary, surety contracts are strongly construed against a compensated surety. In this regard claimant argues that the compensated surety is not released from liability in the event of default by the contractor as a result of alterations or additions to the contract when such alterations and additions are provided for or contemplated by the contract or bond, and such provisions in the contract or bond has the effect of waiving notice of such alterations or additions to the surety. Based on this premise, claimant submits that since Article 24 of the contracts in question (hereinbefore set out in full), clearly contemplated changes in the work might be effected, violation of the contractual provisions requiring that additions and changes be in writing and notification of the contractor's default be given the surety, are inconsequential and do not release the present surety.
While our jurisprudence does recognize a difference between the obligations of a compensated surety as distinguished from a simple or uncompensated indemnitor, as contended by illustrious counsel for claimant, the issue of whether changes or alterations of a contract in violation of the terms thereof, effects legal release of the surety on a performance bond appears to depend upon the nature and extent of the changes in each particular case as well as upon the question of whether the surety is attempting to assert the defense against the claim of the owner, contractor, or a third party materialman or workman.
Certain changes in the construction contract have been held not to release the surety. In Segari v. Mazzei, 116 La. 1026, 41 So. 245, (suit by the owner against the surety) a change of the site of a dwelling house, to be constructed, from one place to another in the same square, for the accommodation of the owner, and without causing additional expense to the contractor, where the site was not described in the contract with sufficient clarity to properly identify it, was held not such an authorization as would discharge the surety of the contractor.
In an action by an owner against a compensated surety on the contractor's bond it has been held that changes in plans and specifications consisting of a minor change relative to the roof of the structure in question did not release the surety. Natchitoches Sweet Potato Co. v. Perfection Curing Co., 153 La. 916, 96 So. 808.
Minden Presbyterian Church v. Lambert, 167 La. 712, 120 So. 61, involved claims of materialmen made parties to a concursus *645 proceeding instituted by the surety. The bond therein involved referred to a contract dated July 19, 1923 with "First Presbyterian Church, Minden, La.," whereas the contract was in fact dated July 3, 1923, and was entered into with "Minden Presbyterian Church". The Court therein held that the surety was not relieved from liability under the bond because the bond sued on was not connected with the contract pursuant to which the work was performed. Although this particular case does not involve a change or alteration of the construction contract as such, but rather a discrepancy between contract and bond, the problem thereby presented is analogous to the instant litigation.
In Jacob A. Zimmerman & Son v. United States Fidelity & G. Co., 150 La. 277, 90 So. 647, a prime contractor sued his subcontractor and the surety on the subcontractor's bond for damages resulting from alleged breach of the subcontract which, inter alia, contained the following provision:
"Neither the subcontractor nor his sureties shall be released from the whole or any part of the obligation hereby assumed by reason of any change in the amount, nature, scope, character or extent of the work, or in any plan or specification, or in any mode or time of payment, * * * or by any extension of time or indulgence granted to the subcontractor, even though any or all of said acts be without the knowledge and consent of the subcontractor or his sureties, unless such release be expressly made in writing by said contractor."
The court, in the Zimmerman case, supra, gave effect to the aforesaid provision regarding changes and alterations and declined to relieve the surety from liability on the ground that changes were made in the manner of performance of the work called for in the contract.
In Town of Mandeville v. Paquette, et al., 153 La. 33, 95 So. 391, the owner sued the contractor and the contractor's surety on a contract involving construction of a sea wall. The surety defended on the ground that a change in the terms of payment of the contractor enabled the contractor to set a longer row of pilings than should have been left exposed to possible storm damage, thereby prejudicing the surety without its consent. The court found that less damage would have resulted if backfilling had been accomplished as quickly as the pilings were set, which would have been the case if no change had been made in the method of payment to the contractor. The court concluded that since the contract did not specify the manner in which the work was to be performed the change in method of payment was not forbidden by the terms of the bond and the surety was not relieved of its obligations thereunder. The court further found that the change in method of payment did not require a change in the manner of performace but merely enabled the contractor to set pilings ahead of the backfilling. Additionally, the change in the terms of payment was held not violative of the bond provisions relative to changes in plans and specifications. The court also found that the surety had apparently acquiesced in the change by agreeing to an extension of the term and acknowledging that the contract was being performed satisfactorily in accordance with its provisions.
Bickham v. Womack, et al., 181 La. 837, 160 So. 431, involved suit by a materialman against the owner, contractor and surety for accounts representing materials furnished the contractor. The court therein held that because the owner changed the contract's terms by making payment to the contractor in scrip rather than cash such payments did not release the owner's obligation to laborers, materialmen and furnishers of supplies. The court also refused to apply to the compensated surety involved therein the rule of strict construction applicable to accommodation or uncompensated sureties upon authority of Victoria *646 Lumber Co. v. Wells, et al., 139 La. 500, 71 So. 781.
It has been held, however, that material and substantial changes will discharge a compensated surety. French Market Ice Co. v. Landauer, 4 Orl.App. 87; Diana Brick & Tile Co. v. Fidelity & Deposit Co. of Maryland, 8 Orl.App. 76.
Wells v. Fidelity & Deposit Co. of Maryland, 146 La. 169, 83 So. 448, is authority for the proposition that in an action by the owner against the surety on the contractor's bond, extensive changes made by the owner involving material departures from the contract plans and specifications, involving increased responsibility and expenditures, without written orders stating the cost thereof, contrary to a contract clause providing that no alterations should be made except upon written order stating the amount to be paid therefor, released the surety from all obligations arising incident to such changes.
We note in the Wells case, supra, the following significant language which we herein quote with approval:
"* * * though it was a part of the contract that in its execution there might be departures from the specifications, and though any such agreement would be valid as between those parties, we do not think that, as between them and the surety on the bond, departures involving an admitted increase of, say $14,000 of expenditure in a contract calling for $23,000, can reasonably be held to have been within the contemplation of the surety. * *"
In the Wells case, supra, the court stated further that assuming an increase of $14,000 in a $23,000 contract could be held within the contemplation of the surety and that the surety could still be bound for a 20-story $100,000 building on a contract for a $20,000 4-story edifice, for example, it would then become necessary to consider whether a stipulation in the contract requiring changes to be made in writing had been complied with. The court further observed that the surety is presumed to know the terms and conditions of his obligation and "no one has the right to assume that, because it was willing to guarantee execution * * * of a building contract calling for the expenditure of $23,000 in accordance with certain drawings and specifications, and containing an express stipulation that no alterations departing from these specifications should be made in the work, except upon the written order of the architect stating the * * amount thereof * * * it would have been willing to guarantee a contract involving an expenditure of, say, $37,000 * * * of which $14,000 * * * were to be expended without written orders." The court distinguished Wells v. Fidelity & Deposit Co. of Maryland, supra, from the Victoria Lumber Company case, supra, predicated upon the following language appearing in the earlier decision:
"If this were a suit by the owner of the building against the surety of the contractor, a different question would be submitted for solution."
Victoria Lumber Company v. Wells, supra, permitted recovery by a materialman against a compensated insurer notwithstanding the initial contract of $23,000 was exceeded by $11,000 as the result of certain changes and alterations agreed upon between owner and contractor. The changes involved were made in abrogation of a contract provision that all alterations and changes should be made upon written order of the architect, stating the amount. Two bonds were given in that caseone for faithful performance of the work and the other to insure payment of wages of laborers, workmen and mechanics and claims of furnishers of materials and supplies. The latter bond specifically related that it was given in accordance with Act 180 of 1894 and that materialmen, mechanics, laborers and furnishers of supplies were given individual rights of action thereon. The court therein stated that although the provisions of the contract were written into the bond, the materialmen and laborers could not be deprived of the right given them by statute *647 because of the unauthorized acts of the owner and contractor.
In Savings & Homestead Ass'n v. Frank, 146 La. 198, 83 So. 491, the owner and contractor entered into a new contract without the consent or knowledge of the surety. The court held therein that, as between the contractor and owner, the surety was relieved of its obligations since the surety's contract could not be changed without its consent. However, the court reserved to the materialmen the right to assert claims against the surety in the event their demands were not otherwise satisfied. The court expressed the further opinion that the owner and his property should be held to stand between the claims of materialmen and the surety on the bond but declined to express "an opinion upon the question of the liability vel non of the surety for such claims".
The difference herein noted in the jurisprudence as regards claims of materialmen as distinguished from those of the owner, is likewise noted in the applicable statute, namely LSA-R.S. 9:4806, which reads as follows:
"§ 4806. Owner's personal liability
"* * * In all cases where surety has been furnished, as between such surety and any claimant for labor or material or any sub-contractor, journeymen, cartmen, truckmen, or mechanic, the surety shall be entitled to make only the same defense as the contractor for whom he signed as surety is authorized to make; but as between the surety and the owner, the surety may urge any defense growing out of any violation by the owner changing the contract without the consent of the surety, including the defense that the owner has made anticipated payments, to the extent that the surety is damaged by such violation or anticipated payment."
See also Audubon Homestead Ass'n v. A. Stef Lumber Co., 158 La. 1054, 105 So. 62.
Our jurisprudence appears established to the effect that despite prohibitions against changes and alterations except under specified circumstances, where a building contract does in fact contemplate changes, the surety may reasonably expect changes to be made and must proceed with the knowledge that not every unauthorized change or alteration will discharge him from his obligation to the owner. Under such circumstances changes or alterations which do not materially affect the surety's liability or exposure and which bear reasonable relationship to the extent and value of the original project will not relieve the surety of his liability to the owner.
In the case at bar, however, as contended by esteemed counsel for appellants, the changes made by claimant constitute radical departures from the original agreements. In each case completion dates were extended for terms at least twice the initial construction period specified. The present claims are in effect sub-contracts entered into subsequent to expiration of the original construction period and seek to recover for labor and material furnished after the initial contract period had expired. In the present case, both contracts were, for all practical purposes, entirely new agreements considering the prices to be paid were increased from $6,780.00 to $16,249.68 in one instance and $13,900.00 to $24,618.15 in the other. Clearly, the violations herein shown were of such magnitude as to discharge the surety of all liability to appellee-owner.
The remaining contention of claimant is that the bonds in question were statutory bonds having been executed pursuant to the requirements of LSA-R.S. 9:4801 et seq., consequently under the jurisprudence all provisions of the statute must perforce be read into the bonds. Based on this premise, able counsel for claimant maintains that LSA-R.S. 9:4806 provides that "In all cases where surety has been furnished, as between such surety and any claimant for labor or material or any sub-contractor, *648 journeymen * * * the surety shall be entitled to make only the same defense as the contractor for whom he signed as surety * * *", therefore, claimant being the subrogee of materialmen, assuming the defense of breach of contract provisions were open to the surety as regards any claim by appellee as owner, such defense is unavailable against appellee as subrogee of parties against whom such defense is not permitted because, as subrogee, claimant is entitled to all rights and privileges available to its subrogors.
Assuming, arguendo, the bonds in question to be statutory bonds as contended by claimant, the position predicated upon such supposition is clearly untenable under the circumstances surrounding the instant case.
Pursuant to the aforesaid provision of LSA-R.S. 9:4806, and the jurisprudence of this state as well, the owner's breach of the terms of the contract cannot be imputed to materialmen or workmen to defeat their claims against the surety. This does not mean, however, that an owner guilty of contractual violations sufficient to release the surety may absolve himself of the consequences of his own misconduct and assume the role of innocent third party by means of subrogation to the rights of strangers to the contract. This is especially so where, as in the case at bar, the owner failed to discharge his obligation of giving the surety notice of the contractor's default within a reasonable time of the occurrence thereof so that the surety might protect its interests by paying the materialmen whose claims had not been satisfied by the contractor and then proceed against the contractor to recoup such of the surety's losses as were recoverable. The bonds in question provide that in the event of the contractor's default, a written statement of particulars, including the date and nature of the default, must be immediately given the surety by registered mail addressed to its home office in New York, the requirement being made a condition precedent to the owner's recovery on the bonds. The obvious purpose of such a provision is to enable the surety to protect its interest, if possible, and thereby minimize or reduce its loss in the event of default by the contractor. Assuming the bond to be statutory, as claimant maintains, claimant was not thereby relieved of the duty of fulfilling its obligations to the surety which were made condition precedent to claimant's recovery.
For the reasons hereinabove assigned, it is ordered, adjudged and decreed that the judgment of the trial court be reversed and judgment rendered herein in favor of appellants, the Superintendent of Insurance of the State of New York and Rufus D. Hayes, Insurance Commissioner of the State of Louisiana, as Domiciliary Receiver and Liquidator and Ancillary Receiver, respectively, of Preferred Accident Insurance Company of New York, in receivership, and against claimant, Cities Service Oil Company, dismissing and rejecting said claimant's demands at said claimant's costs.
Reversed and rendered.