(119 So. 56)

No. 29054.

**STATE et al. v. SMITH et al.**

Oct. 2, 1928. Rehearing Denied Nov. 26, 1928.

Spearing & Mabry, of New Orleans, and Mc-Coy, Moss & King, of Lake Charles, for appellant U. S. Fidelity & Guaranty Co.

Lemle, Moreno & Lemle, of New Orleans, for appellant Standard Oil Co. of Louisiana.

Nicholas Callan, of New Orleans, for defendant Wm. H. Smith, Jr.

Percy Saint, Atty. Gen., J. J. Robira, Dist. Atty., of Lake Charles, and W. M. Barrow, of Baton Rouge, for appellees Louisiana Highway Commission.

Cline & Plauche and C. S. Girod, Jr., all of Lake Charles, for appellees Stewart, Thomas, Bank of Coushatta, and Smith.

J. Sheldon Toomer, of Lake Charles, for claim of D. E. Barnes.

OVERTON, J. This is a proceeding brought by the state of Louisiana, the Louisiana highway commission, and the police jury of the parish of Calcasieu, to recover judgment against W. H. Smith, Jr., and his surety, the United States Fidelity & Guaranty Company, in the sum of $58,582.26, with legal interest thereon from judicial demand, and 10 per cent. attorney's fees, as damages for their failure to complete, according to contract, the construction of an embankment for a public highway, in the parish of Calcasieu, through the Sabine swamp, to a bridge crossing the Sabine river. The basis of this demand is that Smith failed to complete the work he had contracted to do, and that his surety failed to complete it in his place, as a result of which plaintiffs, after putting both in default, were forced to readvertise and relet the completion of the work at a loss exceeding the amount sued for, which, excepting the attorney's fees claimed, represents the amount of the bond furnished by Smith. A number of claimants of privileges for material furnished in the construction of the work were cited to assert whatever claims they

might have against Smith and his surety. The proceeding, therefore, partakes of one in concurso.

Those claiming privileges appeared and asserted them. Smith, as a defense to the demand against him, pleads that the contract was not finished by him by reason of any fault of his, and that, had plaintiffs themselves complied with the contract and permitted him to finish it, he would have earned $236,500 for overhauls of dirt with which to construct the embankment, for which amount he asks for judgment in reconvention against the Louisiana highway commission. He also pleads that he is not liable for the loss sued for by plaintiffs, because, in reletting the contract for the completion of the work, plaintiffs relet it on terms and conditions differing from, and more onerous to, the contractor than those in the contract with him, as a result of which the price bid by the new contractor was much greater than it otherwise would have been. The defenses of the surety are substantially the same as those of Smith. Especially does the surety rely on the defense that the changes made in reletting the contract released it from liability under the bond. Both Smith and the surety, in their pleadings, deny the existence of the privileges asserted by those claiming them.

This litigation grows out of the following facts:

On September 14, 1925, the Louisiana highway commission and the police jury of the parish of Calcasieu entered into a contract with Smith for the construction of what was known as Federal Aid Project 43–D, unit 1, being the roadway embankment for the Vinton-Orange Highway in Calcasieu parish. The embankment was to have been built by Smith, 1.857 miles in length, through the Sabine swamp, to a point on the Sabine river. This was a difficult place to construct an embankment, due to the marshy character of the soil and the difficulty in obtaining suitable dirt with which to build it. Smith was to receive a minimum price of $117,164.52 for the work, based on an estimated quantity of 325,457 cubic yards of "borrow" (that is, dirt taken from plots of ground near the sides of the embankment), complete in place, at 36 cents a cubic yard. The contract provided that Smith should complete the work within six months, and, if he should fail to do so, then that he would pay the Louisiana highway commission $50 a day thereafter, until the completion of the work, as liquidated damages. Smith furnished a bond, under Act 224 of 1918, for $58,582.26, one-half of the minimum price he was to receive, which also represents the amount sued for, with the United States Fidelity & Guaranty Company as surety, conditioned for the faithful performance of the contract, and for the payment by the contractor and all subcontractors for all work done, labor performed, or material furnished in the construction of the embankment. The specifications, which formed part of the contract signed by Smith, for the purpose of guarding, among other things, against any error in the estimated quantity of "borrow," necessary to be moved into place to complete the embankment, contained the following provisions, numbered 29 in the specifications, to wit:

"The contractor shall perform such work, in additional quantities other than those designated in the approximate estimate, as may be deemed necessary fully to complete the proposed construction as planned and contemplated and shall receive for such additional work payment in full, at prices shown in the contract and in the same manner as if such work had been included in the original estimate of quantities."

The specifications, forming part of the contract, also contained the following provisions defining "roadway excavation" and "borrow," and providing for the measurement of overhaul of excavation, and the payment therefor, as well as the basis of payment for putting all "borrow" complete in place, to wit:

"72. *Roadway Excavation*. Roadway excavation shall include the removal and satisfactory disposal of all materials except borrow [defined in paragraph ·76], necessary for the construction and preparation of the roadbed, subgrade, shoulders, slopes, side ditches, incuts, trenches, waterways, intersections, approaches, private entrances, etc., as indicated and directed. * * *

"76. *Borrow*. When the amount of the embankment exceeds the amount of the excavation, sufficient suitable material shall be obtained by the contractor from the sides of the roadway, side ditches or other borrow pits as directed, by the engineer. This material shall be known as 'borrow' and shall be of a satisfactory quality for the purpose for which it is required. Borrow shall include removal and satisfactory placing of the additional material necessary to complete the embankment, subgrades, shoulders, etc. The widening of cuts will not be considered as 'borrow.'

"77. *Overhaul of Excavation*. When the distance between the center of mass of any cut and the center of mass of the corresponding embankment exceeds 400 feet, all of the material obtained from the cut and used in the embankment shall be known as 'overhaul excavation,' and the length of overhaul shall be measured as the distance between the center of mass of cut and center of mass of fill, minus 400 feet.

"82 (b). *Borrow*. All borrow (Defined in paragraph 76), will be paid for at the contract unit price per cubic yard for 'Borrow' complete in place, which price will include furnishing and placing the material, and all equipment, tools, labor and work incidental thereto.

"82 (c). *Overhaul*. Overhaul of excavation will be paid for at the rate of one (1¢) cent per cubic yard per station of 100 feet. The amount of overhaul will be estimated in the manner specified under the heading 'Overhaul of Excavation.' "

Before Smith bid on the work, he, in company with an engineer of the Louisiana highway commission, visited the location where the embankment was to be constructed. It was readily ascertainable from a view of the location that there would be no occasion to excavate any part of the route for this section of the highway, but to the contrary, it was apparent that it would be necessary to fill every foot of the route to the required height with dirt obtained from points along the sides of the route. While Smith was there the engineer pointed out to him two plots of ground from which dirt was to be taken to construct the embankment for the roadway—one of which was on the south side of the route, and the other a five-acre tract, on the north side. At that time, and for some time after the signing of the contract, those were the only two tracts, under the control of plaintiffs, along the right of way, from which dirt could be taken to construct the embankment.

Smith, so he testifies, reached the conclusion that, under the specifications, the contractor would be entitled to additional compensation for the overhaul of borrow at the rate of one cent a cubic yard for every station of 100 feet the borrow would be hauled beyond the 400-foot limit, as was provided for the overhauling of excavations, making no distinction between the hauling of excavations and the hauling of borrow beyond 400 feet. He also says that he reached the conclusion that there was not sufficient dirt available in the two plots of ground, under the control of plaintiffs, to construct the embankment, which later developments, it may be said, proved to be correct, and that he would be fully justified in bidding the price he did, relying upon the overhaul of borrow to make up the deficiency and to earn a profit. On the other hand, plaintiffs were under the impression that the specifications did not contemplate that there should be an additional charge for hauling borrow beyond any prescribed distance, as was the case with excavations, but that all borrow, without reference to the distance hauled, should be paid for at the unit price a cubic yard for borrow complete in place, as provided in paragraph 82 (b) of the specifications, quoted supra.

The federal government was aiding in the construction of the embankment by contributing a part of the cost of construction. Shortly after the contract between plaintiffs and Smith was signed, namely, on September 30,

1925, the highway engineer, attached to the Bureau of Public Roads at Washington, concluding that there was some room for misunderstanding as to whether the hauling of borrow beyond a distance of 400 feet, as in the case of excavations, should be treated as an overhaul, and paid for accordingly, addressed the following communication to the Louisiana highway commission, to wit:

"Reference is had to your letter of September 29, 1925, in regard to the contract on Unit 1 of Louisiana Federal Aid Project 43–D.

"We note that you state the contract specifically states 'complete in place' and that sections 77 and 82–C of the 1924 specifications [quoted supra] do not apply to 'hauled in material.' This feature should be brought out more clearly either in your special provisions or through a letter between the contractor and the Highway Commission.

"In looking over the contract I note that all contracts for item No. 3 state 'complete in place'; in all cases, paragraphs 77 and 82–C of your general specifications apply. Furthermore, it states in the contracts that the 1924 specifications would apply and we do not find any reference in this contract or other contracts just how the material is to be hauled in. We believe that this matter is so important that a definite understanding in writing should be had between the contractor and the Highway Commission whether or not paragraphs 77 and 82–C (relative to the overhaul of excavation and payment therefor) of the 1924 specifications apply. * * * "

In connection with the foregoing letter, the state highway engineer; under date of October 8, 1925, wrote Smith as follows:

"With reference to your contract for the embankment on Project No. 43–D, the U. S. Bureau of Public Roads has raised the question of whether payment for overhaul will be claimed for embankment quantities. We have advised them that the contract price covers excavation, overhaul and all labor, materials or incidentals in placing the material, and we have a letter from Mr. John R. Hunter dated July 4, 1925, stating that you concur in this understanding.

"Will you please advise us, by endorsement on this letter, that no claim for the payment of overhaul on embankment quantities will be made, and forward this letter to your bonding company for a similar endorsement. We will

greatly appreciate it if you will expedite this action, as we cannot obtain the payment of federal funds allotted to this project until this matter is settled."

Smith indorsed at the foot of the foregoing letter the following, which he signed and had his surety sign approvingly, to wit:

"When overhaul is not in excess of distances shown on plans there will be no charge for overhaul in this contract."

On December 11, 1925, at a conference held between the Louisiana highway commission on one side, and Smith and his surety on the other, or immediately thereafter, Smith addressed the following letter to the commission, which was approved by the commission and by Smith's surety, as indicated by their indorsements and signatures, to wit:

"Confirming conference of this date between yourselves, representatives of the United States Fidelity & Guaranty Company, and myself, I hereby agree to construct the embankment in the Sabine River Marsh, project 43–D, unit No. 1, in accordance with the original section at 36 cents per cubic yard for all material placed in the embankment from the free haul zone on the south side of the present highway, between stations 1595 and 1612 and from the 5-acre tract on the north side of the highway from which I am at present moving material.

"In the event that additional borrow pit areas are secured on the south side of the present highway within the free haul zone between stations 1595 and 1612, I understand that the Louisiana Highway· Commission agrees to pay to me a lump sum of $1,000 to cover the cost of changing my tracks, which extra work would be made necessary on account of being unable to procure this right of way at the outset. I understand also that I am to place the necessary quantity of material in the embankment if available from the free haul borrow pit zone to complete the embankment as originally provided in the plans, even though the total yardage so placed in the embankment should greatly overrun the original estimated quantity of 325,475 cubic yards."

After the foregoing letter was written and approved by the commission and Smith's surety, Smith continued for several months

his work of constructing the embankment, when he found that the time in which he was to complete the work had about expired. So finding, on March 20, 1926, he wrote the Louisiana highway commission, asking for time within which to complete his contract. About two days later, the commission was notified by its resident engineer that Smith had abandoned the work. On March 24, 1926, Smith appeared before the commission and notified it that he was unable to proceed with the work. Smith's surety, after considering the matter, refused to complete the work in Smith's place. Both Smith and his surety were then put in default.

Within 60 days after Smith had defaulted on his contract, the Louisiana highway commission, which was in charge of the execution of the work, advertised for bids to complete the construction of the embankment, undertaken by Smith, as covered by the original contract, dated September 14, 1925, and the supplemental agreement, dated December 11, 1925, appearing in the form of a letter from Smith to the commission, quoted supra. After the advertisement was completed the contract was awarded to the Gifford Construction Company at 67 cents a cubic yard for placing borrow complete in place in the construction of the embankment, as against 36 cents a cubic yard, the compensation stated in the contract entered into with Smith.

While the advertisement for bids apparently calls for the letting of the completion of the work under the same conditions as the entire work was let to Smith, yet the proposal form, sent to prospective bidders, upon which they were to prepare their bids, contains a provision which was not in the proposal form sent Smith, nor in his contract. This provision was carried into the contract, signed by the Gifford Construction Company. The provision inserted in the contract, as relet, reads as follows:

"No overhaul is to be paid on borrow listed under item No. 3a, as the price bid on this item is to include all hauling from the borrow pits designated under paragraph 3 of these special provisions."

Item No. 3a and paragraph 3, referred to above, are one and the same, and are contained in the special provisions of the original contract signed by Smith, and, so far as pertinent, read as follows:

"All material necessary to build the roadway embankment will be obtained from borrow pits located along either side of the highway from station 1595 to station 1612 except that no earth shall be removed from the right of way of the present highway which extends 150 feet on each side of the center line. * * * "

During the course of the work, plaintiffs, finding that the ground they controlled, when Smith signed the contract, would be insufficient to furnish the required dirt to complete the embankment, obtained plots of ground on both the north and south sides of the embankment with which to do so. While Smith was at work, he hauled borrow from the land on the south side of the embankment, and from the 5-acre tract on the north side, under the control of plaintiffs at the time he signed the contract. The Gifford Construction Company, in completing the work under its contract, hauled borrow, not only from those tracts, but from the additional tracts on both the north and south sides of the line of the embankment, acquired by plaintiffs.

When this suit was filed, demanding of Smith and his surety damages for loss sustained, equal to the amount of the bond furnished by the former, it was evident that, based upon the bid of the Gifford Construction Company, and plaintiffs' contruction of the Smith contract, plaintiff would sustain a loss, by reason of Smith's failure to complete the contract, exceeding the amount of the bond. While the suit was pending in the lower court, the work had then progressed so far that it was known that plaintiffs had

sustained such a loss, viewed from their standpoint, and accordingly plaintiffs filed an amended petition setting forth that they had actually sustained a loss exceeding $62,000, which was several thousand dollars in excess of the bond, and offered proof, in accordance with their interpretation of the contract, sustaining that loss.

■ The correctness of plaintiffs' demand depends primarily upon the construction to be given their contract with Smith. If the contract signed by him on September 14, 1925, which was the original contract with him, stood alone, it is not unlikely that it would be held that Smith would not be entitled under it to overhaul of borrow, taken anywhere from between stations 1595 to 1612. This likely would be the interpretation that would be given that contract, if it stood alone, because it provides that the embankment shall be built of material obtained from borrow pits located along either side of the highway between those stations, without reference to any particular ground or pits along that line, and because that contract distinguishes between borrow and excavation, and while providing for overhaul of excavation, meaning roadway excavation, makes no provision for overhaul of borrow, but provides that "*all borrow* (italics ours) will be paid for at the contract unit price per cubic yard for 'borrow' complete in place," which in this instance was 36 cents a cubic yard. These provisions apparently mean that the hauling of borrow will be paid for at the contract unit price of 36 cents a cubic yard, no matter from what plot or plots of ground, along the right of way, between the stations mentioned, the borrow may be taken, or from which it might become necessary to take it, and without reference to the distance it might be necessary or advisable to haul it.

But the contract was amended by the supplemental agreement of December 11, 1926, quoted supra, in the form of a letter from Smith to the highway commission. This supplemental agreement was expressly or tacitly approved by all the parties at interest, and is treated by plaintiffs in these proceedings as an amendment to the contract. It is the meaning of Smith's contract, touching the right to demand compensation for overhaul of borrow, as amended by the supplemental agreement, that must be ascertained. By the supplemental agreement Smith consented to construct the embankment "in accordance with the original section at 36 cents per cubic yard from the free haul zone on the south side of the present highway, between stations 1595 and 1612, and from the 5-acre tract on the north side of the highway." By that agreement Smith also expressed it as his understanding that he was "to place the necessary quantity of material in the embankment if available from the free haul borrow pit zone to complete the embankment as originally provided in the plans, even though the total yardage so placed in the embankment should greatly overrun the original estimated quantity of 325,475 cubic yards." By the supplemental agreement, Smith was also to be paid $1,000, which was later paid him, to defray the cost of changing his railroad tracks, should the highway commission secure additional borrow pits on the south side of the highway.

From the foregoing it appears that, by the supplemental agreement, the free haul zone on the south side of the highway was defined to be all the territory lying between stations 1595 and 1612, it being the intention to make that territory a free haul zone, without reference to the distance the borrow might be hauled. This interpretation is strengthened by the arrangement made with Smith as to relaying his railroad tracks in the event additional borrow pit areas should be secured on the south side of the highway. By that agreement the free haul zone on the north side of the highway was defined to be what

is known as the 5-acre tract, which is the same tract that was under the control of the highway commission when Smith signed the contract. By specifically designating this tract, on that side, and no other, the supplemental agreement apparently excluded from the free haul zone on the north side of the highway all other tracts, without reference to the distance it might be necessary to haul the borrow. But this is only seemingly so, for the purpose of the supplemental agreement was to settle the contention then existing as as to the right of Smith to charge for the overhaul of borrow, on the same basis as he would have to charge for the overhaul of excavation, had there been occasion to make such overhaul. It was the intention of the parties by the supplemental agreement to make all of the 5-acre tract on the north side, as was done with all of the territory on the south side, between the stations mentioned, a free haul zone—that is to say, a zone from which there should not be any charge for overhaul—without reference to the distance it might be necessary to haul the borrow, but, as reasonably might be expected, not to exclude from that zone any other territory, where, in order to put the borrow in place, in the systematic construction of the work, it would be necessary to haul it only 400 feet or less, thus making it possible for Smith to obtain compensation for overhaul of borrow, depending upon the locality from which it would be necessary to haul it, and the length of the haul. It was from the free haul zones only, as thus defined, that the unit price of 36 cents a cubic yard was, by that agreement, as the sole measure of compensation, applicable, for it was from those zones only that Smith agreed to haul borrow and put it in place at that price.

The foregoing interpretation is not adversely affected by the clause in the supplemental agreement relative to placing the necessary quantity of material from the free haul zones in the embankment, if available, to complete it, even though the total yardage, so placed, should greatly exceed the original estimated quantity of 235,475 cubic yards, but that interpretation is rather supported by that clause. The purpose of that clause was not to limit to the free haul zones the amount of work to be done, for Smith had bound himself in the first part of the supplemental agreement, as in the original contract, to construct the embankment, which means the embankment completed, but to make it clear that he was to do so from the free haul zones, so far as possible, which would be at the price of 36 cents a cubic yard, even though the yardage should greatly exceed the estimated quantity of 325,475 cubic yards, and that, in order to avoid extra cost, he was obligated to haul from the free haul zones, as defined above, so long as dirt was available therefrom, rather than, at his convenience, to go beyond them.

As relates to the compensation Smith was to receive for overhaul of borrow, while the contract as amended, though by implication it recognizes his right to it, by using the expression "free haul zone," in connection with the moving of borrow, by defining those zones, by limiting the price for hauling borrow therefrom to 36 cents a cubic yard, and yet contemplating that he should complete the work, even if the free haul zones were insufficient, nevertheless does not fix the amount of compensation for such overhaul, unless it does so by implication. However, as the purpose of the supplemental agreement was to settle the contention as to the right of Smith to charge for overhaul of borrow on the same basis as he would have to charge for the overhaul of excavation, had there been occasion to make such overhaul, we think that it was within the contemplation of the parties that the charge for the overhaul of borrow, in the event there should be such overhaul within the purview of the

▇▇▇▇▇

contract as amended, should be the same as that for the overhaul of excavation. This conclusion cannot be well escaped.

From the foregoing our conclusion is that the free haul zone on the south side of the highway consisted, by the Smith contract as amended, of all the territory along the line of the highway, between stations 1595 and 1612, and that the free haul zone on the north side consisted of the 5-acre tract on that side; but as to any other tracts, between those stations on that side, such tracts were not in the free haul zone, unless the haul from them, in the systematic construction of the work, was 400 feet or less, and that, where Smith, under his contract as amended, was entitled to compensation for overhaul of borrow, he was entitled to it on the same basis as for overhaul of excavation.

▇ Such being, in our view, the correct interpretation of the contract as amended, it is therefore, in our opinion, clear that, when plaintiffs relet the work with an added provision in the contract to the effect that no overhaul would be paid on borrow obtained from borrow pits along either side of the highway from station 1595 to 1612, as the price bid must include all hauling from the borrow pits indicated in the special provisions to the specifications, which were designated as borrow pits located along either side of the highway, between the stations mentioned, they changed what was termed the free haul zone on the north side of the highway, in the Smith contract as amended, by enlarging that zone, and therefore relet the work under a condition materially different from the conditions in the Smith contract as amended. The effect of this change, as might be expected, had a direct tendency to increase the bids per cubic yard for the putting of borrow in place, for, although it might become necessary, which it did, to take borrow from the north side, from other ground than the 5-acre tract, and although it

might be necessary to haul it from such other ground for a greater distance than 400 feet, still there would be no right to charge for an overhaul.

▇ Smith and his surety urge that the foregoing change discharges them from any liability to plaintiffs because of their alleged failure to complete the work. This position is not sound. When a principal and his surety fail to complete a contract, their liability for such damages as may be suffered attaches the moment they are put in default. The reletting of the work under a condition, or subject to a term, differing from the former contract, in order to complete the undertaking, does not alter the prior contract, and does not, of itself, discharge the principal and surety thereof. See United States v. United States Fidelity & Guaranty Co., 236 U. S. 512, 35 S. Ct. 298, 59 L. Ed. 696. However, the changed condition or new term may have the effect of virtually discharging the principal and surety, by rendering proof of the amount of loss impossible. Where, however, the work to be done under the new contract is the same, and is to be done in the same location and manner, as under the former contract, it is possible to make such proof. In the case at bar it was possible to make the proof necessary to obtain a judgment against the principal and surety for the loss suffered, if any. The work was the same under both contracts. It was to be done in the same location and manner under both. It required the same number of cubic yards of borrow, under either contract, to complete the work, to be hauled in the systematic construction of the embankment the same distance, from pits along the right of way; the only difference between the two contracts being the right of Smith to charge for overhaul of borrow, under the circumstances stated above. It is possible, therefore, to ascertain with reasonable certainty the amount of overhaul to which Smith would

have been entitled, had he completed his contract. This, added to the total of the yardage, at the unit price of 36 cents a cubic yard, Smith would have been entitled to, for performing the remainder of his contract, had he completed it, and the sum thus obtained, deducted from the amount earned by, and paid to, the Gifford Construction Company, for doing that work, should give with reasonable certainty the amount of loss, if any, sustained by plaintiffs, because of the default of Smith and his surety.

However, the proof offered by plaintiffs to show the loss was not offered along these lines, but upon the theory, which they were contending for, that there was no difference between the two contracts, and hence that the proper method of showing the loss was to deduct the product of the total yardage, at 36 cents a cubic yard, as representing the amount that Smith would have been entitled to, had he completed the work, from the product of the same yardage, at 67 cents a cubic yard, as representing the amount that the Gifford Construction Company had earned, disregarding altogether the right of Smith to overhauls, when, as a matter of fact, it was necessary to haul borrow on the north side of the highway from other land than the 5-acre tract, and at such distance as to entitle him to compensation for overhaul. The evidence, offered by Smith and his surety, fails to show that plaintiffs have not suffered a loss, and it is impossible to ascertain from the record what loss, if any, plaintiffs have suffered. However, as it is possible for plaintiffs to establish the loss, they should be given an opportunity to do so, and Smith and his surety should be given an opportunity to rebut the evidence offered for that purpose. To give such an opportunity, this case will be remanded as to that phase of it.

With reference to Smith's reconventional demand, in our view, it is not well founded. It is based upon the theory that the highway commission, by refusing to allow him for overhaul of borrow, made it impossible for him to complete the work, and therefore that he is entitled to the amount he would have made for overhauls, had he been permitted to complete the contract. Smith made no overhaul of borrow while he was working under the contract. His work had been confined to the south side of the highway and the 5-acre tract on the north side. His failure to complete the contract was not due to any action of the highway commission, but, as stated by him to that body, as his reason for not continuing with the work, and as confirmed by him in his evidence on the stand, that failure was due to the fact that, after exhausting all resources, he found himself financially unable to complete it. The trial court therefore properly rejected Smith's reconventional demand.

As relates to the various claimants asserting claims against the fund in court, consisting of the bond furnished by Smith, the claims of 11 of these were rejected by the lower court on the theory that they had no privileges or rights against the fund to be distributed. Of these, only 5 have appealed, namely, the Berdon-Campbell Furniture Company, who asserts a claim and privilege against the fund for furniture, bedding, and utensils to equip the camp where the laborers lodged and boarded; the Sabine Supply Company, who asserts a claim and privilege against the fund for hardware, consisting of spikes, plates, etc., used on the railroad constructed by Smith to haul borrow; the Norwell-Wilder Hardware Company, who asserts a claim and privilege for hardware sold Smith and used by him in the construction of the railroad mentioned above; the Standard Oil Company, for oil and gas used in operating machinery employed in constructing the embankment; and D. E. Barnes, for plain piling used for a temporary trestle from which dirt to construct the embankment was

dumped. Of these, only the two last named have filed briefs or made an appearance in this court. Our brother of the lower court, in passing upon these claims, said:

"It will be seen that none of the supplies or materials enumerated entered into the structure of the road embankment. They were used to supply or repair equipment, or for camp facilities for the workmen, or fuel for the machines. The statute grants a privilege for 'material furnished in the construction, erection, alteration or repair of such road.' If this language is intended to describe material entering into and forming part 'of the structure, according to its specifications and design, it of course, excludes the items enumerated, and such must be the interpretation. While there are equities favoring a different view, the term 'material,' when found in a building statute, generally means something which becomes incorporated as a part of the building or structure, and it would require extremely liberal construction to construe it to include 'supplies' not forming part of the structure."

The material and supplies, here under consideration, were furnished under Act 224 of 1918, under which the work performed by Smith was done, prior to the passage of Act 271 of 1926. The ruling made by the lower court is in accordance with the later ruling of this court in the case of Red River Construction Co. v. Pierce Petroleum Corporation, 165 La. 565, 115 So. 752, and should not be disturbed.

█ All of the foregoing creditors, whose claims are before us on their own appeals, appear to have obtained judgment against Smith for the amount of their claims, in separate proceedings, except the Standard Oil Company. That company, whose claim against Smith, for oil and gasoline sold him amounts to $859.34, with legal interest from March 12, 1926, concedes in this court that the right it asserted in the lower court against the bond furnished by Smith is not well founded, under the decision of this court in the Red River Construction Co. Case, cited supra, though it urges that it should be given personal judgment against him for the

amount of its claim. The Standard Oil Company has proven the amount of its claim. We see no reason why, although the claim of that company is not protected by the bond, and although it has no privilege on the fund to be distributed, it should not be allowed in this, a concursus proceeding, personal judgment against the contractor, to whom it sold the merchandise, for the amount of its claim, rather than relegate it to a separate action to obtain such judgment, merely because the part of its demand mentioned has been defeated. Therefore the judgment of the trial court should be amended, so as to allow such a judgment.

█ Of the various claimants, asserting claims against the bond, the court rendered judgment against Smith and his surety in favor of J. O. Stewart, T. L. Thomas, the Bank of Coushatta, and J. B. Smith, each of whom claims to be an assignee of, and a subrogee to, the claims of laborers on the work. No contest is made as to the allowance of the claim of J. O. Stewart, save as to attorney's fees awarded him. Therefore it is unnecessary to pass on that claim, except as to those fees, which will be done later. As to the remaining claims allowed, the surety urges that these claimants are not properly either assignees or subrogees, and hence that their claims against it should be rejected. The facts, touching this phase of the case, briefly stated, are as follows: Smith, who was without money to pay his labor, obtained, at various periods during his operations, money with which to do so from these claimants, who, acting independently of each other, appointed Smith their agent to obtain assignments and subrogations for them. Contemporaneously with the payment of the money to the laborers, Smith obtained from them, by private act, the assignments and subrogations relied on. The acts, if valid, are valid as acts of subrogation. If the money was *borrowed* by Smith for the purpose of pay-

ing these debts, with the intention of subrogating the lenders to the rights of the laborers, then there was no subrogation, because, suffice it to say *the borrowing* was not by notarial act, nor were the receipts issued by the laborers by such act. Civil Code, art. 2160, par. 2. On the other hand, if the money was paid directly to the laborers by the claimants, or by them through their appointed agent, the subrogations having been made contemporaneously with the payments, and being express, are valid. Civil Code, art. 2160, par. 1. The receipts, or acts of subrogation, recite that the money was paid to the laborers by the claimant asserting the subrogation. While Smith, in his evidence, sometimes, at least, refers to the obtaining of the money as an act of borrowing, yet we think that the evidence, as a whole, shows that this money was not loaned, but was placed in the hands of Smith by these claimants, who unquestionably appointed him as their agent to pay these laborers and obtain the acts of subrogation, which he did. As these claims were due the laborers, and were protected by the bond, when paid by these claimants, the payments having been made with express subrogation, the surety has no right to complain of the judgment, as to this phase of the case.

The surety complains of the judgment for 10 per cent. attorney's fees rendered against it on all these latter claims, including the allowance of them on the undisputed claim of Stewart. The sole basis of this complaint is that attorney's fees are not allowable to a claimant, whose claim is connected with the construction of public works, although the claimant should recover the full amount of his claim against the contractor and his surety, when the claimant is cited by the owner to assert whatever claim he may have in the concursus provoked by the owner. The case of Favalora v. Bourgeois, 164 La. 521, 114 So. 119, is cited in support of this contention. However, that case is not pertinent here. The ruling there made was concerning attorney's fees on a claim connected with the construction of a private work, and was prompted by the phraseology of Act 225 of 1918, under which the claim for attorney's fees arose. The claim for attorney's fees here made is not controlled by that act, but by Act 224 of 1918, which relates, among other things, to the allowance of attorney's fees on certain claims connected with the construction of public works. Section 8 of that act clearly allows the fees here demanded.

For the reasons assigned, it is ordered that the judgment appealed from be amended, by allowing the Standard Oil Company of Louisiana judgment against said Smith for said sum of $859.34, with legal interest thereon from March 12, 1926; that the judgment appealed from, in so far only as it allows plaintiffs a part of their demand against said Smith and the United States Fidelity & Guaranty Company, be set aside; that this case be remanded to the lower court, to enable plaintiffs to prove their demand against said Smith and said United States Fidelity & Guaranty Company, in accordance with the views herein expressed, and, in all other respects, it is ordered that said judgment be affirmed.