371 So.2d 641 (1979)
CENTRAL LOUISIANA ELECTRIC COMPANY, Plaintiff-Appellant,
v.
GIANT ENTERPRISES, INC. and American Fidelity Fire Insurance Company, Defendants-Appellees.
No. 6879.
Court of Appeal of Louisiana, Third Circuit.
May 4, 1979.
Rehearing Denied June 21, 1979.
*643 Landry, Watkins & Bonin, William O. Bonin, New Iberia, for defendant-appellant.
Deutsch, Kerrigan & Stiles by Marian Mayer Berkett, New Orleans, for defendant-appellee and defendant-appellant, American Fidelity Fire Insurance Co.
Lewis Ray Sleeth, Jena, for defendant-appellee.
Edward G. Randolph, Jr., Alexandria, for plaintiff-appellee.
Before WATSON, CUTRER and SWIFT, JJ.
SWIFT, Judge.
The above numbered and entitled suit grew out of a contract dated January 31, 1972, between Central Louisiana Electric Company, Inc. (Cleco) and Giant Enterprises, Inc. (Giant) for the clearing of land to create a lake to be used in connection with Cleco's proposed Rodemacher Power Station. It was consolidated for trial and appeal with No. 6880 on the docket of this court entitled, "Labor Services, Inc. v. CFC Construction Company et al." La.App., 371 So.2d 654." Although this opinion will deal with both cases, separate decrees will be rendered in each one.
In No. 6879 Cleco seeks damages from Giant and its surety, American Fidelity Fire Insurance Company (American), for alleged breaches of Giant's clearing obligation. Giant's defense is that Cleco failed to comply with its contractual obligations, mainly in not timely acquiring and making available for clearing the land and timber affected by the contract. American defended on the basis that it was released from its suretyship obligation by reason of alterations of the contract by the parties without its consent and Cleco's failure to give it notice of Giant's alleged breaches. American filed a third party demand against Giant, its president, Carl F. Childress, his wife and Lewis R. Sleeth on an indemnity agreement executed in connection with the issuance of the bond.
Labor Services, Inc. (Labor), the plaintiff in the suit No. 6880, sued CFC Construction Company (CFC), as Giant's subcontractor or assignee, Cleco and American to recover under the Private Works Act (LSA-R.S. 9:4801 et seq.) sums allegedly due for services, labor and materials furnished on the project by Labor under a subcontract with CFC. Cleco third-partied Giant and American and the latter did the same to its indemnitors.
A third suit, filed by CFC against Cleco for damages allegedly incurred from its attempted *644 performance of the contract, was also consolidated for trial with the other suits. However, we are not concerned with it as no appeal was taken from the judgment denying recovery by CFC.
In our No. 6879 the trial court rendered judgment against Cleco denying recovery from Giant and American and the plaintiff therein appealed suspensively.
In the other suit judgment was rendered in favor of Labor against CFC and Cleco for $21,000.00, with interest and costs. On the third party demands, judgments were rendered in favor of Cleco against Giant and American for the amount of Labor's judgment against Cleco and in favor of American and against the indemnitors named above for the amount of Cleco's judgment against American, reserving to the latter the right to establish its claims for attorneys fees and expenses when finally determined. Both Cleco and American perfected suspensive appeals. None of the other parties appealed or answered the appeals in this suit.

THE ISSUES
The principal issues presented on these appeals are:
I. Whether Cleco substantially breached the contract, thereby precluding its claim for damages resulting from Giant's nonperformance?
II. Whether American was released from its bond obligation by alterations of the original contract by its parties without the surety's knowledge and consent?
III. Whether Labor is entitled to a personal action against Cleco under the Private Works Act and, if so, what items are recoverable therein?

THE FACTS
The lake to be developed through damming the cleared land was to be used for cooling the generators in an electric power plant which Cleco was constructing. It was scheduled to be in operation in June, 1975, before the peak load season, and to accomplish this Cleco believed it was necessary to begin impounding water behind the dam by November 1, 1972. Consequently, that was the completion date in the contract whereby Giant agreed to remove and dispose of all trees and other woody growth larger than two inches in diameter and/or eight feet in length below the 100 foot elevation of the clearing area. The consideration therefor was the lump sum of $494,218.00.
Although the contract was dated January 31, 1972, and contained a starting date of February 1, 1972, it was not actually signed by Giant and delivered to Cleco for its signature until February 22, 1972. However, Giant was notified by telephone and in writing shortly before February 1, 1972, that it was the successful bidder. The performance bond, which by agreement was reduced from the amount of the contract to $200,000.00 because that was all Giant could obtain, was not furnished until about May 1, 1972.
On May 9, 1972, Giant executed a subcontract and also an assignment of all its rights and obligations under the clearing contract to CFC. At this time Charles F. Childress was the owner of all of the stock and president of both corporations. This transfer of interest was never approved in writing by Cleco as required by the clearing contract with Giant. However, Cleco continued to deal with Mr. Childress, as president of both companies, in regard to the clearing subsequently done by CFC.
During the first two months of the contract period the work actually performed consisted simply of Giant's engineers, Sample and Jenkins, staking the contours of the lake and Ray Dauzat, a subcontractor of Giant, clearing approximately 40 acres of land during a total of about five working days. Giant itself did not begin work on the project until April 6, 1972. This delay apparently came about because Mr. Childress, the Giant's project manager, and the equipment to be used were on another job in Oklahoma.
Cleco made repeated oral and written requests that Giant pursue the work more diligently and employ more men and equipment. *645 Giant gave similar, but not nearly as many, notifications that its operations were being hindered and made more costly by the lack of available land to clear. Also, it complained of flooding caused by obstruction of the natural drainage by other contractors. However, as late as August 29, 1972, with much of the most difficult work left to be done, Giant continued to express confidence in its ability to perform. By this time Childress had decided they were not going to be able to successfully drain Grubb Lake and other swampy areas and to cut the timber therein with bulldozers as contemplated, so he proposed amending the clearing contract to provide for hand-cutting of the trees with chain saws and removing the logs and debris when they floated to the surface after the water was impounded. The amendment also called for a change in the price and required American's approval. Although no definite agreement in this respect was ever reached by the parties, CFC went forward with chain saw operations.
While it had been discussed before and Giant had instructed its engineers not to stake the proposed fish habitats, it was not until January 15, 1973, that Cleco gave written notification that it was deleting 330 acres, previously pointed out for this purpose, from the clearing contract and requested negotiations for a price reduction as provided therein.
The contractor failed to finish the clearing by November 1, 1972, the completion date in the contract. However, impoundment of the reservoir was not begun until March, 1973. The last work done on the project by Giant or CFC was in early February of that year. By letter dated March 12, 1973 Giant was formally placed in default. At that time 160 acres of timber in the Grubb Lake area remained uncut. Also, in low areas surrounding the lake and in the fingers north of the dikes timber that had been cut by chain saws was left on the ground. Thereafter, Cleco employed others to complete the clearing operation at a cost of $305,992.54.
The trial judge held generally, ". . . that Cleco was mutually at fault with Giant in causing Giant's breach, and that Giant too, for various reasons, was also responsible for its own failure to fulfill its contractual obligation to clear the lake area." Therefore, neither Cleco nor CFC were entitled to recover in their respective suits. As authority, he cited Silverman v. Caddo Gas & Oil Co., 127 La. 928, 54 So. 289 (La.1911) and the court's syllabus which reads:
"A party cannot claim damages for the nonperformance of a contract as to which he himself is in default."
The Louisiana law on this subject is also generally stated in Olympic Insurance Company v. H. D. Harrison, Inc., 463 F.2d 1049, 1053 (5 Cir. 1972) as follows:
"Similar to other jurisdictions, Louisiana recognizes the principle that where one party substantially breaches a contract the other party to it has a defense and an excuse for non-performance."
Neither side finds fault with this principle of law. Nor do we.
Unquestionably, Giant defaulted in its obligation to clear the land according to the terms of the contract. But its surety, American contends, as it did successfully in the trial court, that Giant's failure to fully perform was excused by substantial breaches of Cleco's obligations under their contract in: 1) Failing to provide timely sufficient lands free of timber reservations on which Giant could work economically; 2) Failing to coordinate adequately the work of various contractors on the site; 3) Failing to pay monthly installments according to the terms of the contract; and 4) Interfering with Giant's right to timber on the site.
Cleco emphatically denies it breached the contract in these respects and contends that Giant simply failed to timely and properly pursue the work with sufficient men and equipment.

I.
(1) Availability of Lands.
The record reflects that at the inception of the contract approximately one-half *646 of the total acreage had been acquired by Cleco free of timber reservations and was available to the contractor for clearing. According to a letter dated January 21, 1972, from Cleco's project engineer, J. T. Simms, Jr., to Giant's then president and attorney, Louis R. Sleeth, confirming their discussions at a meeting on January 19:
"We discussed the fact that approximately ½ of the total acreage within the confines of the clearing limits have not been acquired by Cleco, yet. We are negotiating with two land owners at present on a major portion of this and expect good news shortly. Presently about 1576 acres are in Cleco's possession, within the confines of the clearing limits, of which about 644 acres are in swamp, 469 acres in hill timber or cut over lands, and 463 acres in pasture and pecan trees. The majority of the 644 acres in swamp is contiguous to itself and to the bayous that form a drainage outlet from the swamp. You felt sufficient acreage of all types was presently in Cleco possession to allow starting of work, and the unacquired property would cause no hardship provided it was obtained in a reasonable time. If the contractor was delayed because of lack of property to work in, Cleco would discuss compensation for this, if contractor could show he was hurt by this delay."
Mr. Childress testified in this regard as follows:
"Q Did anyone at Giant Corporation ever tell you how much land that was available for clearing before you moved on it?
A Yes, sir, they said it wasn't all available, the exact acreage I don't remember, but said it wasn't all available.
* * * * * *
Q How did you get that information and from whom?
A From either Mr. Sleeth or Mr. Baker, Buddy Baker, one.
* * * * * *
Q When was that?
A It was between the bid date and the signing of the contract somewhere and I'd say in late January or February.
Q Was your advice sought as to whether Giant would go ahead and sign that contract knowing that all the land was not available at the time?
A Yes, sir.
Q Your opinion was sought as the project engineer?
A Yes, sir.
Q And it was your opinion that the - - - that Giant would go ahead even though all the land was not available?
A Yes, sir.
Q Did you make any inquiry of anyone as to exactly what land was available or would be available at the time of the signing of the contract?
A Yes, sir, Mr. Simms and I discussed it. I don't remember what time it was, but Mr. Simms and I discussed the availability of land and how much it was there and how long it would be before they got the rest of it.

Q But you knew at the time the contract was signed what land was available at that time, did you not?

A Yes, sir.
Q And you were satisfied that you could go ahead?

A Yes, sir." (Emphasis added)
Thus, it is clear Giant knew before the contract was signed what land and timber were available and was satisfied it could go ahead with its operations under the contract without hindrance from this factor. Mr. Childress did say Cleco had informed him it had the right to expropriation and could get the additional land within 90 days, if necessary. However, this was not confirmed by Mr. Simms, and it was not shown with any degree of certainty that Cleco failed to so obtain within such time any particular tract which Giant needed.
By letter of March 10, 1972, Cleco furnished Giant the names of the persons from *647 whom it had acquired land, with the dates on which any reserved timber rights expired, and also a map prepared by Pan American Engineers locating the tracts. Cleco continued to cooperate with Giant in this respect.
Both parties agreed that the swampy areas, and particularly that referred to as Grubb Lake, should be cleared first. This was made clear by the testimony of both Mr. Sleeth and Mrs. Childress and also confirmed in the above mentioned letter of January 21, 1972 as follows:
"You plan to concentrate on the hardest to clear areas first. If a time problem developes in the future, some additional time beyond November may be allowed on clearing on the higher ground, while the lake is filling. You could and would do clearing from barges if necessary while the lake is filling, in the swampy areas, you said."
Giant made two unsuccessful attempts to drain the swampy area, first by cutting a drainage ditch with a dragline and then extending same through blasting with explosives. It was not established whether or not the area could be drained by other methods. The trial judge traced Giant's difficulty in draining Grubb Lake to negligent clearing which barricaded and prevented its natural drainage. He also concluded that the presence of an artesian well condition did not render the contract impossible of performance.
In any event, as heretofore mentioned, the contractor concluded that such drainage was not economically feasible and continued to fell timber in higher locations and eventually cut most of the trees in the swampy areas with chain saws rather than tractors.
Giant had no records to establish its contention that its operations were shut down or delayed at any particular times for definite periods by reason of the unavailability of lands. Mr. Childress testified that Giant's activities were hampered frequently by the lack of timberlands to cut, but he was able to recall only one particular instance of this nature where he said he had paid $50.00 to an adjoining landowner to prevent interruption of the continuity of the clearing operations. On the other hand, Mr. Simms' assistant, George E. DeSoto, kept detailed records of where and when the clearing took place and both insisted that timberland was always available for Giant's operations. From our review of the record, we believe this was the case, but after the clearing was well underway it appears that most of the available acreage was in the swampy areas.
The contract, of course, provides that all of the land affected thereby be cleared. Consequently, there was sufficient timberland available for this purpose at all times. Certainly, it cannot be said that Cleco substantially breached the contract in this respect, in the absence of a showing that it was responsible in some way for the difficulties encountered in cutting the timber in the wet areas.
Paragraph 3 of the General Conditions of the clearing contract provides in part as follows:
"Contractor shall make a thorough field check for the purpose of verifying existing conditions that may affect the WORK, such as: possible errors in work previously done by others, difficulties that might be encountered in the execution of the WORK for any other reason, and dimensions and other questions relating to inter-connection of the WORK with the work of other." (Emphasis added.)
Paragraph 9 of such conditions provides in part as follows:

"If completion of the WORK is delayed by an act or neglect of Purchaser or other contractor in the employ of Purchaser, by strikes, or by other exceptional conditions over which Contractor has no reasonable control the time of completion shall, upon receipt of Contractor's written request, be extended by such period as the Consulting Engineers may consider reasonable. No such extension shall be allowed unless a claim therefor is presented in writing to Purchaser and the Consulting Engineers within seven days of the commencement of such delay. In case of a *648 continuing cause of delay only one claim is necessary." (Emphasis added)
Both Mr. Sleeth and Mr. Childress readily admitted that the latter had made all necessary inspections of the premises before bidding on the contract. There was water standing at a number of places on the land at that time. However, Giant was satisfied it could be drained and most of the clearing work could be accomplished with bulldozers. It is clear that Giant was well aware of the existence of the swampy areas. It simply erred in concluding from its own inspection that these could be drained and dried in a relatively short time.
Cleco made no representation in these respects. Therefore, it was in no way responsible for the real cause of Giant's nonperformance within the completion date of the contract which was that the swampy areas were never drained.
We are convinced from our review of the record that the contractor would not have completed the work it was obliged to do under this contract by November 1, 1972, if all of the land and timber in the clearing area had been available for its operations on February 1, 1972, unless the swampy areas had been adequately drained so that the land could have been cleared with tractors as originally contemplated by Giant. Consequently, even if the lack of access to parts of the land could be considered a breach of this contract, it was not a substantial breach thereof because it was not an actual cause of the contractor's failure to comply with its obligations. It is obvious Giant did not consider this to be a real cause of any delay in its work at the time, because it made no request for an extension of the completion date by reason thereof under Paragraph 9 of the General Conditions of the contract.
(2) Coordination of Contractors.

As shown above, Paragraph 3 of the General Conditions required Giant to make a thorough field check of the premises not only to ascertain the existing conditions but also any difficulties that might be encountered "relating to inter-connection of the Work with the work of others." In addition, Paragraph 15 thereof requires the contractor to have a competent superintendent on the job to supervise and conduct the work in cooperation with Cleco and its consulting engineers, "and in coordination with all other work being done on the premises".
From this it appears that the primary responsibility for coordinating the work of the project was on the contractors, not Cleco. Be that as it may, there were only two minor complaints in this category. One concerned the blocking of a drain from the swamp by Louisiana Paving Company through the building of a road which was removed within a day or so following a heavy rain. The other involved the construction of permanent dikes by the same company in the northeast portion of the area behind which water collected.
Giant knew when and where the dikes were going to be built and most of the timber in the areas to the north thereof was cut by it in April and May of 1972 before construction began.
Cleco's position in this respect was communicated to CFC in its letter of July 3, 1972, as follows:
"As you know, Louisiana Paving has started construction of flumes and dikes. Some of the areas that you have left behind and not cleared, that are wet in the bottom, will be cut off by the installation of the dikes. On several occasions we had requested of you that these areas be cleared so this drainage conflict would not occur. If heavy rains are experienced, these areas will flood and will be most difficult to clear. Since you have let good opportunities go by, and have instead selected to work on the much, much easier areas, we do not feel that extra compensation can be requested by you for any additional effort you must expend to clear these areas. As you know, the time is such that we cannot delay the installation of the flumes and dikes, and they must be complete in time for impounding of water in the lake. To assist you, however, in keeping these areas somewhat drained, Louisiana Paving *649 have agreed to provide a ditch in the bottom of the flumes once they are dug, and to maintain these for a reasonable time, provided you are making every effort to clear behind the dikes. All of this was discussed with you on June 28th, also."
In view of the general conditions mentioned above, we do not believe that either of these occurrences constituted a breach by Cleco of the clearing contract. Clearly, neither would amount to a substantial breach. It was not established that Giant incurred any additional expense by reason thereof and apparently they had no real adverse effect on its ability to timely complete the work. If such was the case, any delay caused by these acts of another contractor in the employ of Cleco would give rise to an extension of Giant's completion date under Paragraph 9 of the General Conditions of the contract.
(3) Payment of Monthly Installments.

The clearing contract of January 31, 1972, provides for monthly payments to the contractor, subject to a 15% retainer, based on ". . . the mutually-agreed-upon value of the materials delivered on the premises and/or work done as estimated by Contractor and approved by the Consulting Engineers. In no case, however, shall Contractor be entitled to a payment which in the judgment of the Consulting Engineers will leave the balance withheld insufficient to complete the WORK."
Actually, the partial payments were not made every month, but as and when submitted by Giant and "agreed-upon" by Cleco's representative. None of these were submitted for approval to Sargent & Lundy, Cleco's consulting engineers.
Mr. Childress testified that Cleco was never willing to pay for the full amount of clearing done and rather than delay receipt of the money his company simply revised its estimates to correspond with Cleco's figures and accepted payments based thereon. On the other hand, Cleco's representatives testified the contractor was paid without undue delay for all work accomplished after the clearings set forth in the estimates had been checked and the only disagreement between the parties they recalled concerned Estimate No. 5. This was mutually resolved within a short time.
The record shows that all of the estimates were signed by the contractor and Cleco and were paid within a few days after being submitted to the latter except Estimate No. 7, the last. It was submitted on March 9, 1973, when Cleco was in the process of terminating the contract because no work had been done since early February. Cleco's Mr. DeSoto said the last estimate was not paid because the quantity of work for which the payment was requested had not been done. In addition, its sum, the previous payments and the amount to be paid for the remaining uncleared area on the basis previously employed would exceed the total consideration for all of the work in the contract.
Cleco presented detailed evidence on the progress of the work. Giant introduced only the statement first submitted for work involved in Estimate No. 5 and the general testimony of Mr. Childress that his company had been underpaid.
The contract did not provide any monetary basis for computing the amounts to be paid monthly as the work progressed. Therefore, it was mutually agreed between the parties to use the unit prices which Giant had submitted in its bid for any extra work. After it was agreed between Cleco and Giant as to the type and amount of acreage cleared in each period, it was paid for at those prices, less 15%.
Apparently, no real dispute occurred until the last estimate was submitted as both parties signed each estimate and the contractor was paid on the basis of their mutual agreement. No letters of protest or demands were made by Giant in this connection. Nor did it ever request that its estimates be submitted for approval to the consulting engineers. Actually, there would be no reason to submit such estimates for anybody's approval in the absence of a dispute between the parties.
*650 The fact that Giant did not choose to submit estimates of the work done every month and receive payments therefor at the end of each period did not constitute a breach of contract by Cleco. The same can be said with respect to Giant's failure to request approval of the payments by the consulting engineers. Certainly, they were available if a real dispute had arisen requiring their approval. The evidence does not indicate in any way that Cleco was not ready and willing to pay the contractor monthly for all work actually performed by it on the basis of its "mutually-agreed-upon value." Under the circumstances, this court concludes there was no substantial breach of the contract in this respect by Cleco.
(4) Dispute Over Timber Rights.

It is also contended that Giant's ability to perform under the contract was hampered by a dispute with Cleco as to the ownership of the timber on the premises.
Section 2-103.2(e) in the Technical Requirements part of the contract provides as follows:
"Contractor shall have full property rights to all timber cut by him, but shall not conduct any sales of merchantable timber, nor do any processing of merchantable timber, on the site."
Giant's position was that by this provision it acquired title to all of the timber in the clearing area which it could have sold, either to timber harvesters or others, and realized some $199,000.00 therefrom to finance its own operations under the contract. Because Cleco disputed its ownership of the timber and permitted other parties to harvest some, Giant realized less than $10,000.00 from the timber and was deprived of necessary working capital.
Like the trial judge, it is our opinion that Giant erroneously interpreted the above quoted contractual provision. This was a clearing contract, not a timber sale. The contractor only acquired ownership of the timber cut by him and was specifically prohibited from selling the standing timber. Mr. Sleeth informed Mr. Simms at the beginning that Giant had no interest in the timber. It was well aware of the fact that Cleco intended to harvest some of the trees through others. This was made clear by the following exceptions in Giant's bid and the contract:
"7.3 Owner agrees that any timber removed from the project area will be cut to meet the Specifications of this Contract.
"7.4 Contractor will not be delayed by the timber contractors who may be working in the contract area."
Also, there is correspondence between the two parties in the record confirming that the height of the stumps left by Cleco's timber harvesters conformed to the clearing contract. There is no evidence of any protest by Giant in regard to the operations of any harvester that Cleco permitted on the premises.
While Cleco did later agree that Giant could sell some standing timber to another party it was not obligated to do so. Therefore, its prior position to the contrary was not a breach of the clearing contract between these parties.
We are convinced that Cleco did not substantially breach the contract. Having concluded the trial judge was manifestly in error in this respect, the judgment in Giant's favor must be reversed. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1979).

II.
American also contends that it was released from its suretyship obligation because of alterations of the bonded contract by the parties without its knowledge and consent.
The surety has the right to stand on the terms of the contract as written and if a change therein is made without his knowledge and consent he is released. C. & W. Construction Co. v. Travelers Indemnity Co., 147 So.2d 706 (La.App. 1 Cir. 1962). However, not every unauthorized change or alteration will discharge the surety. Those which do not materially affect the surety's *651 liability or exposure will not relieve it of liability, particularly where the contract contemplates changes. State v. Preferred Accident Insurance Co. of New York, 149 So.2d 632 (La.App. 1 Cir. 1963). In addition, for an alteration of contract to release a compensated surety, the alteration must not only be material, but must prejudice the rights of the surety. E. E. Rabalais and Sons, Inc. v. United Bonding Insurance Company, 226 So.2d 528 (La.App. 3 Cir. 1969).
Paragraph 16 of the General Conditions of the contract provides in part as follows:
"CHANGES IN THE WORK: Purchaser shall have the right to make any changes in the WORK, the contract price being increased or decreased accordingly. The charge or credit for any such changes shall be determined, at Purchaser's option, by any of the following methods: (1) agreed upon lump sum price, (2) unit prices named in the Contract or subsequently agreed upon in writing, or (3) cost plus provision if named in the Contract."
Thus, the contract which American bonded specifically authorized changes in the work by Cleco, subject to a change in the price.
With this and the jurisprudence in mind, we will proceed to review the surety's contentions as to changes or alterations made by the parties to the clearing contract.
American first contends that the contract was altered by permitting Cleco to harvest some of the timber despite Giant's ownership thereof, that some areas were to be deleted from the contract and that Giant began work even though Cleco was in default of its obligation to acquire and make available all timberland.
As pointed out above, the clearing contract did not vest title to the standing timber in Giant and it specifically recognized that some of it would be harvested by Cleco through others. So far as we can determine the only areas which Cleco attempted to delete from the contract and reduce its price were the fish habitats. Such a change in the work, of course, was expressly provided for in the contract. We do not find any provision of the contract whereby Cleco agreed to make all of the timberlands involved in the contract available on its starting date. We have heretofore stated why Cleco's failure to do so did not constitute a substantial breach of the contract. In our opinion the terms of the contract were in no way changed by these actions. Nor has it been shown that American was prejudiced thereby. American next complains of Cleco's requirement that the harvester of the standing timber under the contract with Giant make his checks therefor payable jointly to Cleco and Giant. The contract contains no provision in this regard, so the procedure followed did not constitute any change thereof. Also, we have previously pointed out that Giant really had no standing timber to sell. Certainly, the surety was not prejudiced in any way by such actions.
American's contention that the contract was changed by a side agreement as to the unit prices and methods used in computing the monthly payments likewise is without merit. As heretofore mentioned, because the contract was silent in this respect Cleco agreed with Giant to use the latter's unit prices for extra work, as set forth in its bid proposal. Obviously, this did not constitute a change in the contract.
The same may be said in regard to American's claim that the contract was impliedly modified by the parties ignoring certain portions of it. There was no obligation on Giant to furnish any soil boring tests or to establish the contour lines of the lake. Consequently, its failure to do so did not change the contract between Cleco and Giant.
Lastly, American complains that the contract was altered by the failure of Cleco to pay monthly for the work done on the project. Except for the last, the estimates were paid within a few days after they were submitted by the contractor. Although the latter failed to do so every month, there is no indication that there was any kind of agreement between the parties *652 not to pay each month or to avoid the consulting engineers in this regard. The parties having agreed as to all of the estimates that were paid, there was really nothing which required the engineers' approval except possibly to see that the total monthly payments did not exceed 85% of the contract price. It was not shown that American was prejudiced in any way by reason of the method employed to make the advance payments.
Accordingly, we conclude that there were no alterations or changes of the original contract by the parties which released American from its bond obligation. Also, since Giant defaulted in its obligations under the contract and Cleco did not commit any substantial breach thereof, the latter is entitled to recover damages from Giant and American. The surety is entitled to recover its damages from the indemnitors.

DAMAGES
The law in regard to recoverable damages for breach of a building contract was generally stated by this court in North American Contracting Corp. v. Gibson, 327 So.2d 444, 450, 451 (La.App. 3 Cir. 1976), writ denied, La., 332 So.2d 280, as follows:
"Under LSA-C.C. Article 2769, if an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he agrees to do it, he is liable in damages for the losses that ensue from his noncompliance with his contract. See also LSA-C.C. Article 1930. The damages due for the breach of contract are subject to certain codal restrictions, the amount of the loss sustained and the profit of which the party has been deprived. In general then, the measure of damages for breach of a contract is the sum that will place plaintiff in the same position as if the obligation had been fulfilled. Harelson v. Parish of East Baton Rouge, 272 So.2d 382 (La.App. 1st Cir. 1972). The amount of damages must, however, be determined in relation to the contract and the circumstances which surround it. Jolley Elevator Company v. Schwegmann Bros. Giant Super Markets, 230 So.2d 640 (La. App. 4th Cir. 1970). Generally, the damage attributable to a defect resulting from poor workmanship is the amount paid to remedy that defect. Co-operative Cold Storage Builders, Inc. v. Arcadia Foods, Inc., 291 So.2d 403 (La.App. 4th Cir. 1974)."
* * * * * *
"However, plaintiff's demands will not be rejected merely because he cannot establish exactly the amount in which he is damaged. Under these circumstances, the court must fix the quantum as best it can. Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971) and cases cited therein."
Cleco's proof of damages consisted mainly of evidence concerning contracts let to others to remove the timber and logs after the lake began to fill with water. These, of course, were not the same as the contract with Giant as it expressly excepted removal of floating material from the lake after impoundment of water. While there is no evidence directly on the subject, the water operation appears to be more costly than removing the felled timber with winches and trucks. Cleco contends an additional delay in impoundment and the starting of its power plant would cause a greater loss. However, there is no definite proof of this in the record. In any event, because of the different conditions we do not believe the plaintiff's award can be computed on the basis of the total consideration for the subsequent clearing contracts, particularly in any judgment against the surety. State v. Smith, 167 La. 301, 119 So. 56 (1928).
Although great discretion is given a court in determining damages once the legal right to recover has been established, we are unable to make any reasonable assessment of the damages to which Cleco is entitled in this case without some evidence showing what it would have cost to remove the timber before Cleco took the necessary steps to fill the reservoir. Under the circumstances, we are convinced that justice would best be served by remanding the case *653 to the district court for the purpose of taking further evidence from both sides on the issue of damages, and particularly estimates of the cost of completing the work according to the original contract had not the lake been filled, if such can be produced. Thereafter, the trial judge will determine under the jurisprudence just mentioned the amount of damages which Cleco is entitled to recover from Giant and American and the award of the latter against its indemnitors, and render formal judgment accordingly.
On the remand the trial court will take into consideration that 330 acres for the fish habitats were deleted by the parties from the clearing contract and its total price reduced by $140.00 per acre or $46,200.00 to the total sum of $448,018.00.

III.
In an unsuccessful attempt to drain the Grubb Lake swampy area CFC entered into a subcontract with Labor to extend the length of a drainage ditch by blasting which had been dug by another concern with a dragline. This work was done during July, 1972. Labor filed an affidavit of its unpaid claim, with an itemized statement attached, in the office of the recorder of mortgages on December 21, 1972. Suit asserting such claim was instituted November 15, 1973, but no notice of lis pendens was filed.
Cleco and American contest liability for this claim under the Private Works Act for several reasons. The first is based on Smith v. Anderson Bros. Corp., 104 F.Supp. 117 (W.D.La.1952), wherein it was held that the clearing of the right of way for a pipeline was not within the purview of the lien statute. That case, of course, is persuasive but not binding on this court.
We have not been cited and our research has not disclosed a case from our Louisiana courts holding specifically that the clearing of land for the erection of an improvement thereon constitutes work under the Private Works Act. However, Long Bell Lumber Co. v. S. D. Carr Const. Co., 172 La. 182, 133 So. 438 (La.1931), so ruled with respect to the Public Works Act then in existence. And in Hunt v. LaChere Maison, Inc., 316 So.2d 850 (La.App. 1 Cir. 1975), a claim for hauling dirt, operating a bulldozer and for performing landscaping service on a lot on which a house was built was held to be lienable under LSA-R.S. 9:4812.
In other jurisdictions courts have construed somewhat similar lien statutes as including the clearing of land on which structures were to be erected. Mazel v. Bain, 272 Ala. 640, 133 So.2d 44 (1961); Green v. Rese, 261 P.2d 596 (Okl.1953).
We believe the LSA-R.S. 9:4801(a), which affords a privilege to every ". . . sub-contractor. . . workman . . . who performs work . . . for the . . . improvement of immovable property . . ." should be similarly construed. Since Labor's service or work was a necessary incident (though unsuccessful) of the contract for clearing between Cleco and Giant and the clearing was a part and parcel of the construction of the cooling reservoir, Labor's claim was lienable as an improvement to the land. The contract not having been timely recorded, under LSA-R.S. 9:4812 Labor had a personal cause of action against Cleco for the amount of its claim for one year following the recordation of its lien affidavit. This suit was instituted timely.
We are not impressed by the contention that Labor's work was not done with the consent of the owner because the latter's contract was with CFC rather than Giant, and their sublease or assignment had not been approved. Cleco made no objection to CFC's performing Giant's work, and in fact gave express permission for blasting the drainage ditch.
Since there are no third parties involved in this matter, we do not believe that Labor's personal action against Cleco and CFC can be defeated by an error in the lien affidavit as to the description of the property upon which its work was done. It was established that the blasting took place in the vicinity of Grubb Lake, which was on land then owned by Cleco and included in the clearing contract.
*654 The contention that some of the items on Labor's invoice were not lienable also lacks merit. The corporation acted through its employees and all of the items on the invoice were involved and expended in the performance of their work in connection with the improvement of the land as stated. Undoubtedly, the questioned items would have been estimated and included in any lump sum or per diem price quoted for such work and no valid objection could have been made as to the amount of the claim if it had been subcontracted on either basis.
We therefore conclude that the judgment of the trial court in suit No. 6880 is correct and should be affirmed.
For the foregoing reasons, the judgment appealed from in No. 6879 is annulled and set aside and the case is remanded to the trial court for further proceedings consistent with the views herein expressed. The cost in both courts will be assessed on final determination.
ANNULLED AND SET ASIDE AND REMANDED.